## Staunton.

### ANN S. PENN v. GUGGENHEIMER ET ALS.

#### October 16, 1882.

76 | 839
94 | 410
76 | 839
95 | 261
76 | 839
104 | 521
76 | 839
107 | 721

1. ELECTION AND SATISFACTION.—The doctrine of election rests upon the equitable principle that he who accepts a benefit under a deed or will must adopt the whole contents of the instrument, conforming to all its provisions, and renouncing every right inconsistent with it. If by one clause of a will a legacy is given A, and by another clause an estate, of which A is the owner, is given to B, unless A surrenders to B the estate A cannot have the legacy.

2. IDEM—*Intention.*—In order to raise a case of election, the intention of the testator to give that which is not his own, must be clear and unmistakable. It is not necessary that the intention be expressly declared; it may be gathered from the whole of the instrument.

3. IDEM—*Presumption.*—Where testator owns only part of the thing given, the presumption is that he intended to give only that which he might properly dispose of, and nothing more ; and it will always prevail, unless by demonstration plain, or necessary implication, the contrary appears.

4. IDEM— *General words.*—If, in making the devise, testator uses general expressions, such as " all my lands," " all my estate," no case of election arises.

5. IDEM—*Specific description.*—But where testator owns only part of an estate and devises the entire *corpus* thereof specifically, a case of election does arise. See opinion of Christian, J., in *Gregory* v. *Gates*, 30 Gratt. 83.

6. IDEM—*Acceptance.*—The election may be made by the legatee impliedly as well as expressly, and whether there has been an acceptance may be determined by the circumstances of the case. Acts of ownership, lapse of time, ability to restore others to the same situation as if there had been no election, are some of the indicia of acceptance.

7. IDEM.—Election once made, expressly or impliedly, is irrevocable, and binds not only the legatee, but all claiming under him.

8. IDEM— *Creditors.*—When election has once been made, and thereby an estate vests in a debtor, the latter can no more defeat the right of *his* creditors to subject that estate to their claims, by a disclaimer of title, than by a voluntary deed of gift or assignment ; and those creditors may resort to a court of equity for the purpose.

Appeal from the decrees of the circuit court of Botetourt county, rendered on the 27th October, 1876, and on the 25th of October, 1879, in the chancery cause therein pending, wherein Max Guggenheimer, Senior, and others were plaintiffs, and William J. Penn, in his own right and as administrator of Stuart B. Penn, deceased, Ann S. Penn, George Skillen Penn, L. U. Mayo and Frances L. Mayo, were defendants. The object of this suit was to ascertain the interest of William J. Penn in the estate whereof Stuart B. Penn died seized and possessed, and to subject that interest to satisfy the liens of the plaintiffs' judgments against William J. Penn.

In Botetourt in 1849, died Charles B. Penn, testate, leaving Ann S., his widow, George S., Stuart B., William J. Penn, and Frances L., wife of L. U. Mayo, his children and heirs; also several tracts of land, numerous slaves and other personalty. By his will he gave George S. his "Lipse place," valued $12,000; to William J., his "Cherry Tree Bottom," valued at $14,000; to Frances L., $10,000 in bank stock and a house and lot in Jackson, valued at $1,200. He owned other tracts of less value, and one undivided third part of a tract of 820 acres on James river, valued at $25,000, the other two-thirds belonging to his wife, Ann Skillen Penn, and derived by her from her father, Colonel George Skillen. It was never divided. At his decease and long before, Charles S. Penn and his wife cultivated it as a whole, and occupied it as their joint residence (the mansion house being on the part thereof owned by her), and it was known as "the home place." In view of these facts, by the third clause of his will he made provision for his son Stuart in these words: "It is my will and desire that my wife shall retain the home place, and that at her death it shall be the property of my son, Stuart B. Penn, *which I hereby give to him, his heirs and assigns forever.*"

To his wife testator gave, as aforesaid, the home place for her life; all his slaves, and the residuum of his estate after paying his debts, which were insignificant. Mrs. Penn remained in possession of the home place, and exercised full ownership over it, until her death, about thirty years afterwards. In 1850, she received of the executors the slaves and personal estate appraised at the sum of $18,375, and gave therefor her receipt in writing, duly witnessed and recorded, and as follows: "Received of George S., Stuart B., and William J. Penn, executors of the last will and testament of my late husband, Charles B. Penn, all the personal estate of the said Charles B. Penn, agreeable to the provisions of his said last will and testament, which is embraced in the following inventory, viz:" then follows the inventory, containing the items of property and the names of the slaves, with the valuation of each.

In the same year, the home place was put on the landbook of Botetourt county, and assessed for taxes in her name as tenant for life and devisee of Charles B. Penn. Of these slaves she remained possessed, except twelve, until their emancipation in 1865. The twelve she divided among her children, as the testator in his will expressed his confidence she would justly do. She never renounced the will, nor had dower assigned her, nor expressed any dissatisfaction with its provisions, until she filed her answer in 1867 to the bill of the plaintiffs. Then she denied that "she had done or suffered anything which could justly, either in in law or equity, divest her of her two-thirds of the said home place, and that the plaintiffs could, in any manner, subject the same to the satisfaction of their judgments against her co-defendant, William J. Penn."

The other defendants appeared not.

Besides the emancipation of the slaves and the perishing of the personal property, many changes had occurred since she received under the will in 1850. William J. Penn had

aliened "Cherry Tree Bottom," become insolvent, and been adjudicated a bankrupt. Stuart B. Penn had died in 1857, intestate and childless, leaving as his heirs at law his mother, his brothers, George and William, and his sister, Mrs. Mayo. During his lifetime, being unmarried, he resided with her on the home place and managed as her agent. William J. Penn qualified as his administrator. He left very little personal estate and many debts, which were afterwards discharged by the administrator with his mother's means.

On the 27th October, 1876, the cause was heard on the pleadings, exhibits, depositions, and reports of masters; and the circuit court entered the following decree, viz:

On consideration whereof (and for reasons stated in a written opinion filed in this cause), the court doth consider that the defendant, Ann S. Penn, under the will of her husband, the late Charles B. Penn, is entitled to retain the whole of "the home place," in the bill and proceedings mentioned, until her death, and that having elected to accept the provisions made for her in the will of her husband, the said Charles B. Penn, she must abide by all the bequests and devises contained in said will, and the court doth also consider that under the said will and the election aforesaid of the said Ann S. Penn; the remainder in the whole of "the home place" aforesaid, consequent upon the life estate of the said Ann S. Penn (as well the portion thereof which belonged to the said Ann S. Penn, as the portion of which the said Charles died seized), passed by devise from the said Charles B. Penn to his son, Stuart B. Penn, and that the said Stuart having died intestate and without children, the remainder consequent on the life estate of the said Ann S. Penn passed by inheritance to the said Ann S. Penn, William J. Penn, George Skillen Penn and Frances L. Mayo, and that therefore the said William J. Penn is entitled to an interest of one-fourth in the whole of the

home place, subject to his mother's life estate, which interest is liable to be subjected by his creditors to the satisfaction of their judgment liens. But before passing a decree to enforce such liens, it appears to the court that there should be an account of the amount and priority of the liens, and this cause is recommitted to Master T. J. Godwin, with instructions to inquire what debts, if any, of the late Stuart B. Penn remain a charge on his estate in remainder in "the home place," and also to take an account of the liens in the inheritance therein of the defendant William J. Penn, having respect to their priorities, and state the same in the order thereof and make report thereon, with any other matters deemed pertinent by himself or required by any of the parties, in time for action at the next term.

In obedience to this decree the master reported liens on the real estate of William J. Penn in favor of the plaintiffs and others to the amount of $11,066.77 as of 1st April, 1878, and that William J. Penn, as administrator of Stuart B. Penn, deceased, "*had no claim against the estate of his intestate.*" To this report the plaintiffs excepted.

The master reported two alternate statements made at the instance of the plaintiffs—one showing an indebtedness of said estate to said administrator in the sum of $14,736; the other in the sum of $11,561.00. To these statements Mrs. Penn's counsel filed exceptions. On 25th October, 1879, the court sustained the last mentioned exceptions, and disallowed the two alternate statements, but confirmed the report in all other respects; and decreed that unless within sixty days thereafter, the defendant William J. Penn should discharge the liens of the plaintiffs and others in the report set forth, then John J. Allen, Esq., special commissioner, should sell the interest of William J. Penn in the real estate of Stuart B. Penn, deceased, the same being one undivided fourth part of the said home

place. From these decrees the said Ann S. Penn obtained an appeal to this court. Pending the appeal she died. The appellees, who were the plaintiffs below at the hearing of this cause, insisted, under the rule of this court allowing a counter appeal, upon the reversal of the last of the said decrees so far as it disallowed the last of the said alternate statements of the indebtedness of the estate of Stuart B. Penn, deceased, to the administrator, and overruled their exception to the report stating that said administrator had no claim against the said estate. The remaining facts are fully stated in the opinion of the court.

*Edmund Pendleton,* for Mrs. Ann S. Penn.

*J. H. H. Figgatt* and *John J. Allen,* for Max Guggenheimer and others.

*G. W. & L. C. Hansbrough,* for George Skillen Penn and Mrs. Frances L. Mayo.

STAPLES, J., delivered the opinion of the court.

The main question in this case turns upon the construction to be given to the will of Charles B. Penn, which was admitted to probate at the September term of the county court of Botetourt, in the year 1849. The testator, at the time of his death, was possessed of a valuable real and personal estate, which he devised and bequeathed to his wife, Mrs. Ann Penn, and to his four children. To his two sons, George S. Penn and William Penn, he gave severally a tract of land. To Mrs. Mayo, his married daughter, he gave certain real estate and a sum of ten thousand dollars in bank stock. To his wife, he bequeathed all his slaves, with the full confidence that she would make such disposi-

tion of them among his children as should be just and equitable, after retaining such of them as she might desire for her own use during her lifetime. His other personal estate he directed to be sold, and the balance remaining, after the payment of his debts, together with the proceeds of any real estate not specifically devised, he bequeathed to his wife, with the full confidence that she would divide it among his children as she might deem just and proper.

The third clause of the will, which gives rise to this controversy, is as follows:

" It is my will and desire that my wife shall retain the home place, and at her death it shall be the property of my son, Stuart B. Penn, which I hereby give to him, his heirs, and assigns forever."

The home place, thus mentioned by the testator, is a tract of about eight hundred and twenty acres—one-half of which, known as the lower half, was the property of Mrs. Penn, devised to her by her father. She was also the owner of one-third of the upper half of the tract, derived by descent from her sisters.

The testator was entitled to two undivided thirds acquired by purchase in the upper half of the tract. So that his interest at the time of his death did not exceed one-third of the entire tract.

The first question arising under the clause already quoted is whether the testator intended to dispose of the entire tract, or whether the will is to be construed as disposing merely of his undivided third.

If the former interpretation be the true one, it is conceded that it was incumbent upon Mrs. Penn, the widow, to make her election, and that she cannot claim both her own estate and the provision made for her by the will.

Before entering into a discussion of that question, it will be proper briefly to advert to some of the principles of law governing in such cases.

The doctrine of election is said to rest upon the equitable ground that no man can be permitted to claim inconsistent rights with regard to the same subject, and that any one who asserts an interest under an instrument is bound to give full effect, as far as he can, to that instrument. Or, as it is sometimes expressed, he who accepts a benefit under a deed or will must adopt the contents of the whole instrument, conforming to all its provisions and relinquishing every right inconsistent with it.

In the terse language of Lord Rosslyn, in *Wilson* v. *Lord Townsend*, 2 Vesey Ju. 697, "You cannot act; you cannot come forth to a court of justice claiming in repugnant rights. When you claim under a deed, you must claim under the whole deed together; you cannot take one clause and advise the court to shut their eyes against the rest. Suppose in a will a legacy is given to you by one clause; by another, an estate of which you are in the possession is given to another. While you hold that, you shall not claim the legacy." Pomeroy's E. Jur. §§ 465, 466; Leading Cases in Equity, vol. 1, part 1, 541, 547, 548; *Kinnard, Ex'or* v. *Williams*, 8 Leigh, 400; *Craig's Heirs* v. *Walthall*, 14 Gratt. 518; *Dixon* v. *McClure, Ib.* 540. In order, however, to raise a case of election, it is well settled the intention on the part of the testator to give that which is not his own, must be clear and unmistakable. It must appear from language which is unequivocal, which leaves no room for doubt as to the testator's design. The necessity for an election can never arise from an uncertain or dubious interpretation of the clause of donation. Pomeroy, 472; 2 Story E. J. §10.

It is not necessary, however, that this intention should be expressly declared. The dispositions of the instrument, fairly and reasonably interpreted, may of themselves show a clear design on the part of the testator to bestow upon the devisee property which in fact belongs to another.

As in other cases, the intention may be gathered from

the whole and every part of the instrument. The difficulty of ascertaining the testator's intent, it is said, is always much greater where he has a partial interest in the estate devised·than where he undertakes to dispose of an estate in which he has no interest.

In the former case, the presumption is that he intended to dispose of that which he might properly dispose of, and nothing more; and this presumption will always prevail, unless the intention is clearly manifested by demonstration plain, or necessary implication on the part of the testator to dispose of the whole estate, including the interest of third parties. Generally when the testator has an undivided interest in certain property, and he employs general words in disposing of it, as "all my lands," or "all my estate," no case of election arises from it; for it does not plainly appear that he meant to dispose of anything but what was strictly his own. 2 Story E. J. § 1087; Pomeroy, § 489.

A case of election does arise, however, when the testator, having an undivided or partial interest in an estate, devises it specifically, thus indicating a purpose to bestow it as an entirety. Ths rule on this subject is thus laid down in Pomeroy Equity Jurisprudence, § 489. Where the testator proposes to give the whole thing itself, using language which by reasonable intention, must necessarily describe and define, the whole *corpus* of the thing in which his *particular* interest exists as a distinct and identified piece of property, then an intention to bestow the whole, and not merely the testator's individual share, must be inferred, and a case for an election arises. This rule is mentioned and commented on by Judge Christian in delivering the opinion of this court in *Gregory et als.* v. *Gates,* 30 Gratt. 83, to which I refer as authority for other views here announced.

Now, let us apply these principles to the case in hand.

In the first place, there can be no doubt that the tract of land or estate in question was universally known and described as the "home place." It is so spoken of by all the witnesses, by the parties, and it was so denominated in all the pleadings. Mrs. Penn, in her answer, describes it as the "home place." She speaks of the upper half of the home place and the lower half of the home place.

It is scarcely to be supposed that the testator would term it differently from every other person; that he referred only to his partial interest of one-third when by universal consent, usage, and habit, the entire tract was known and recognized as the home place. His language is, "That my wife shall retain the home place, and at her death it (the home place) shall be the property of my son, Stuart B. Penn, which I hereby give him, his heirs and assigns forever." What gives some significance at least to this language is that the mansion house, occupied by the testator and his family for many years, was located, not upon the half in which the testator had an interest of two-thirds, but upon that portion exclusively owned by Mrs. Penn. It was this portion upon which the family resided that might with some propriety be termed the "home place," and not the two undivided thirds of one half, constituting merely a part of the tract.

It was said in the argument before this court that the language of the clause now under consideration is different from the other clauses of the will. For example, that the testator when disposing of his own property invariably uses the words, "I give and bequeath," whereas in the present instance he merely expresses the wish that his wife shall retain the home place.

This difference of phraseology grows out of the fact that the testator was carefully defining and limiting an estate to be enjoyed by his wife during her life, and the language used by him was such as he supposed would ac-

complish the object. He then proceeds to say that it is his will and desire at her death it (the home place) "shall be the property of my son, Stuart B. Penn, which I hereby give him, his heirs and assigns forever." It is impossible by argument or illustration to add to the force and perspicuity of this language. Nothing can be plainer, more direct and comprehensive. The cases of *Padbury* v. *Clark*, 2 Mc. and G. 298; *Howell* v. *Jenkins*, 2 J. and H. 706; *Grovenon* v. *Dunston*, 25 Beavan, 97; *Grissel* v. *Twinhoe*, L. Re. 7 Eq. 291, 295; in which it was held that the devisee was bound to elect, are directly in point and conclusive of the question.

The other dispositions made by the testator confirm thoroughly this view of his intention. He gave to his son George S. Penn an estate worth about $11,000; to his son William Penn, an estate of the value of $14,000, and to Mrs. Mayo property worth $12,000 or $15,000.

The provision made for his wife was more than sufficient for her support and maintenance during her life in the most comfortable and abundant manner. If, however, he designed that his son, Stuart B. Penn, should take the one-third of the home place, subject to the encumbrance of the life estate, the provision for him was wholly inadequate and disproportionate to the benefits conferred upon his other children. On the other hand, if the testator intended that the entire home place should be the property of his son, Stuart B. Penn, the period of his enjoyment would be postponed until the death of Mrs. Penn, and the value of the devise would be about equal to the provision for the other children.

I am, therefore, of opinion, that by the plain terms of the will, Mrs. Penn was put to her election, and that she could not and cannot choose both her own estate and the bequests made in her favor.

The next inquiry is, whether Mrs. Penn did, in fact, elect to claim under the will.

An election may be implied as well as expressed. Whether there has been an election must be determined upon the circumstances of each particular case, rather than upon any general principles.   1 Lead. Cases in Equity, 539, 571, 572. It may be inferred from the conduct of the party, his acts, his omissions, and his mode of dealing with the property. Unequivocal acts of ownership, with knowledge of the right to elect, and not through a mistake with respect to the condition and value of the estate, will generally be deemed an election to take under the will.   Pomeroy, §§ 514, 515.   Lapse of time, although not of itself conclusive, yet, when connected with circumstances of enjoyment, may be decisive upon the question of election.

In *Adsit* v. *Adsit*, 2 John. C. R. 448, 451, Chancellor Kent said : " Taking possession of property under a will or other instrument, and exercising unequivocal acts of ownership over it for a long period of time, will amount to a binding election."

" Positive acts of acceptance or renunciation," says Mr. Justice Story, " may arise from long acquiescence, or from other circumstances of a stringent nature, and are not indispensable."

" Again," he says, " it may be necessary to consider whether he (the devisee) can restore other persons affected by his claim to the same situation as if the acts had not been performed or the acquiescence had not existed, and whether there has been such a lapse of time as ought to preclude the court from entering upon such inquiries upon its general doctrine of not entertaining suits upon stale demands or after long delays.   2 Story E. J. §§ 1097–98.

Where the election is once made by the party bound to elect, either expressly or impliedly, and with full knowledge of all the facts, it binds not only himself, but also all

those parties who claim under him, his representatives and heirs.    Pomeroy, 516.

Let us apply these principles to the case before us. Upon the death of the testator, in the year 1849, Mrs. Penn continued in the possession of the home place until the present time, a period of thirty years.    It does not appear that she ever expressed any dissatisfaction with the provisions of the will till the filing of her answer in the cause in the year 1867.    In the year 1850, the entire tract was entered upon the commissioner's books of the county and assessed with taxes in her name, as tenant for life.    Whether this was done by her direction or not, it does not appear; it can scarcely be supposed she was ignorant of a fact disclosed on every tax-ticket paid by her.

It has been already stated that by the will testator's slaves were given to Mrs. Penn, in full confidence that she would make such disposition of them among his children as would be just and equitable, after retaining such proportion of them as she might desire for her own use during her life.

The residue of the real and personal estate was also given to her in trust for the benefit of the children.    In the year 1850, not long after the testator's death, the executors turned over to her the entire personal estate including slaves, and took her receipt stating that this was done in conformity with the provisions of the will.    The executors must therefore have understood that Mrs. Penn had accepted the provision made for her benefit.    Upon no other ground would they have been warranted in thus dealing with the assets.    The terms of the receipt given by her show that she was perfectly apprized of the contents of the will; that she knew the condition and value of the property, and that she had united with the executors in fulfilling the intentions and wishes of the testator.    Had Mrs. Penn renounced the will, as she was bound to do, in

order to claim her own estate, she would have been entitled only to one-third of the slaves for life, and one-third of the personal property absolutely.   As it was, she received from the executors under the will forty-nine slaves, of the value of $18,370, and other property, worth between $5,000 and $6,000.   The testimony shows that Mrs. Penn never made any formal division of the property; that she, however, distributed among her children about twelve of the slaves, retaining the residue in her own possession, for her own use and benefit, until their emancipation in 1865.   It is of no sort of consequence that during his lifetime Stuart B. Penn resided at the home place and managed and controlled all the operations of the estate.   This was, of course, done by the authority of Mrs. Penn, and doubtless for the reason that it was more agreeable to her that one of her sons should relieve her of the trouble and responsibility, to which, amid the infirmities of declining years, she was unequal.   She certainly exercised a dominion and ownership of the property to which she was entitled only under her husband's will, and which she could never have assumed unless she intended to conform to its provisions.

After this long lapse of time, after this long continued enjoyment and possession of the estate, and unequivocal recognition of the provisions of the will by receiving the property from the executors, it is too late for Mrs. Penn, at this day, to disclaim the testator's bounty and assert title to her own estate.

The slaves have long since been emancipated, the personal property exhausted, and it is now impossible to place the children in the condition they would have occupied had Mrs. Penn in the outset declared her intention to hold her own property.

So far from it, it is very clear that she made her election to *claim* under the will, and that she did so with a deliberate and intelligent choice, and with a full knowledge of

all the circumstances, and of her own rights. No possible injury can accrue to any one from the conclusion thus reached, for Mrs. Penn lived and died in the enjoyment of the estate. She never attempted any other disposition of it.

Stuart B. Penn, the devisee, is dead, without children, and the estate has passed in due course of law to Mrs. Penn's children. A contrary decision can result only in disturbing a condition of things settled and acquiesced in for many years by all parties. I think, therefore, there is no error upon this branch of the case in the decision of the circuit court.

The learned counsel for the appellant, in his petition for an appeal, and in his argument before this court, has taken the ground that the parties bringing this suit are neither heirs, nor purchasers, nor beneficiaries, under the will of Charles Penn, but judgment creditors of William J. Penn, and as such intruders and volunteers, seeking to set aside a family settlement, and to vest in William J. Penn an interest which he himself does not claim, and to which he never asserted any title. It will not be denied that complainants, by virtue of their judgments, have a lien upon all the real estate of their debtor, and that under our statute they may enforce that lien in a court of equity.

This right of the complainants, and indeed of all judgment creditors, cannot be affected by any omission of disclaimer on the part of the debtor. According to repeated decisions of this court, when the freehold has once vested, the owner cannot divest himself of the title by any mere parol disclaimer. But he can only do so by deed or some other act sufficient to pass an estate. Even had William J. Penn executed such deed, voluntarily relinquishing his title, his creditors would not be bound by it. When the court has once settled that Stuart B. Penn is entitled to the home place under the will of his father, William J. Penn,

as one of his heirs, has an absolute title to his just share, or proportion of that estate, and his creditors may not only subject it to satisfaction of their debts, but they may resort to a court of equity for the purpose of ascertaining that interest, and of removing every obstacle in the way of the just enforcement of their liens. William J. Penn can no more defeat the claims of *his* creditors by a disclaimer of title than he could do so by a voluntary deed, or gift, or assignment.

In *Dold, Trustee* v. *Geiger's Adm'r*, 2 Gratt. 98, it was held that choses in action, to which the wife becomes entitled during coverture, are liable to the claims of the husband's creditors, and a voluntary relinquishment of the same by the husband, and a settlement upon the wife, before being reduced into possession, will not protect such choses in action from such creditors' claims.

Judge Stanard, in answer to an objection similar to the one made here, said: "I think it may safely be laid down as a just deduction from the elementary principles of our law, that the general rule is that the rights of property of a debtor, whether in possession or in action, present or reversionary, in law or in equity, and of value adequate to pay his debts, and without which he is insolvent, and the payment of his debts must be frustrated, cannot, by the mere volition of the debtor, in the form of assignment, surrender, or other modes of arrest, pass to volunteers without valuable consideration, and be thereby placed in the hands of such volunteers, beyond the reach and secure from the claims of such creditors." This opinion of Judge Stanard, and indeed the decision itself, constitutes a complete answer to the points made by counsel, and render unnecessary any further discussion of the subject.

The next question is, whether the circuit court erred in disallowing the account of William J. Penn against the estate of Stuart B. Penn, for money alleged to have been

paid by the former as administrator of Stuart B. Penn. The latter died in the year 1857, considerably indebted. William B. Penn qualified as his administrator, and removed to the home place, thereafter residing with his mother, the life tenant. There is no doubt that the net income derived from the estate was appropriated by him to the payment of his brother's debts. The only question is, whether this income was sufficient for that purpose, or whether any part of the indebtedness was discharged by William J. Penn out of his private means. William J. Penn, in one of his depositions, states that from 1857 to 1860 he realized from the "home place" an income of $6,196.15, all of which, by the direction of his mother, was applied to the payment of his brother's debts. He further states that Stuart B. Penn had a note in bank of $4,600, for which the witness, at the request of his mother, substituted his own note. The larger portion of this latter note was paid off by him in February, 1864, and the balance in 1865, in Confederate money. This, reduced to its actual value in sound money, amounts to a very insignificant sum.

In the concluding part of William J. Penn's deposition, he expresses the opinion that he has been fully reimbursed for all moneys expended by him in the payment of his brother's debts. Unfortunately for the parties setting up this claim, William J. Penn is their witness and their only witness. They cannot ask the court to discard their own testimony and enter a decree in their favor upon a case unsupported by proof. I have no doubt, however, that William J. Penn has given an accurate and truthful account of his transactions and dealings with the estate.

The home place was regarded as one of the most valuable estates on James river, yielding a large income annually to its owners. A very small portion of its profits was required for the support of Mrs. Penn; the balance passed into the hands of William J. Penn, and I am satisfied that

he was fully reimbursed for every dollar appropriated by him for the payment of his brother's debts.

The complainants, after the fullest opportunity, have been unable to adduce any testimony to the contrary. They are clearly not entitled to a reversal of the decree in the present state of the case, and it is most apparent that nothing is to be gained by further inquiry.

Upon the whole, I think the decree of the circuit court should be affirmed.

DECREE AFFIRMED.