### LINDSLEY v. LINDSLEY et al.
#### No. 12993.

Court of Civil Appeals of Texas. Dallas.
April 12, 1941.

Rehearing Denied May 23, 1941.

Leake, Henry, Young & Golden, of Dallas, for appellant.

Cloyd H. Read, Sawnie R. Aldredge, Hiram F. Lively, Royall R. Watkins, Zellner Eldridge, and J. C. Muse, Jr., all of Dallas, for appellees.

LOONEY, Justice.

Mrs. Marguerite B. Lindsley, surviving widow of Henry D. Lindsley, deceased, brought this action against Porter Lindsley, independent executor and trustee under the will of the deceased, and certain beneficiaries, for its construction; alleging that, a dispute had arisen between plaintiff and the independent executor as to the meaning of the will. The court sustained general demurrers urged by the defendants to plaintiff's petition and dismissed her suit, from which she appealed, and the case is before us for review.

Plaintiff is the surviving widow of Henry D. Lindsley, who died on or about November 18, 1938, leaving a will which has been duly probated in the County Court of Dallas County; the defendant Porter Lindsley, named independent executor and trustee of a trust estate created by the testator, qualified and is acting in such capacities. At the time of the death of Col. Lindsley and for some time prior thereto, he and his wife, plaintiff herein, resided upon and used as their rural homestead, a tract of land, approximately 500 acres, situated in a northernly direction and about three miles from the corporate limits of the City of University Park, in Dallas County. Although this land was the separate property of testator, his widow was entitled, under the Constitution and laws of the state, to use and occupy 200 acres, and the improvements thereon, during her lifetime, or so long as she may elect to use and occupy the same as her homestead, and was entitled to have same, together with exempt personal property, set apart for her use.

The widow contends that she is entitled to receive the real and personal property devised and bequeathed to her by her husband, in addition to the homestead and exempt personal property to which she is entitled as surviving widow under the Con-

stitution and laws. The independent executor, who is in control of all property belonging to the estate, denying this claim, contends that the widow is put to an election, that is, whether she will take the bequests and devises, or the homestead and personal property to which, as surviving widow, she is entitled under the Constitution and laws, but that she is not entitled to both.

These contentions define the issue joined, and indicate the provisions of the will brought under construction, which are as follows: After providing for the payment of his debts, funeral expenses and all estate and inheritance taxes, and directing that his remains be interred in Arlington National Cemetery, the testator proceeds: "I give, devise and bequeath in trust to Porter Lindsley of Dallas, Texas, as Trustee, and his successor trustee or trustees, all my estate, real, personal and mixed, for the following uses and purposes: 1. To my wife, Marguerite Lindsley, I give, devise, bequeath and instruct my Trustee to give her a deed in fee simple title, the residence in which she now lives on Northaven Road, together with all contents therein, except my library as hereinafter provided, and including the lot, about 200 x 200 feet, on which this residence and garage are now situated. And, to her my wife, Marguerite Lindsley, I leave in addition the following: (A) Fifty (50) books out of my library to be selected by her. (B) That part of the livestock now on my Northaven Farms or which may be on same at the time of my decease and described generally as follows: All chickens, turkeys, ducks, guineas, etc., all milk cows. (C) Ten (10) acres of land out of Northaven Farms in addition to the land on which my residence is now situated. This ten (10) acres to be selected by my wife, Marguerite Lindsley, but to be approved by Porter Lindsley." (The acreage was increased by codicil to 20 acres). He bequeathed to his daughter $2,500, which, by the codicil, was increased to $12,500; to his son, Henry D. Lindsley, Jr., he bequeathed $2,500. "To Porter Lindsley, I will and bequeath in fee simple that fifty (50) acres of land out of my Northaven Farms lying in a parallelogram bounded on the East side by Inwood Road, on the South side by Northaven Road, and on the West side by Welch Road, provided that he, Porter Lindsley, desires to build his permanent home on said land. In the event he does not so desire, then this fifty (50) acres will go to my residuary legatee and Porter Lindsley will receive out of my general estate instead of said fifty (50) acres, the sum of Ten Thousand ($10,000.00) Dollars. * * * To Charles McKamy of Carrollton, Texas, I will and bequeath ten (10) acres of land out of Northaven Farms to be selected by him, but approved by Porter Lindsley, on Northaven Road between Preston Road and Inwood Road, provided he, the said Charles McKamy desires to use said ten (10) acres for his permanent home. In the event he does not so use same, then this ten (10) acres shall revert to my residuary legatee. But Charles McKamy can commence improving this ten (10) acres for his home at any time he pleases within five (5) years from my decease." To his secretary $1,000; to the Salvation Army of Dallas $5,000; to the Scottish Rite Crippled Children's Hospital of Dallas $10,000; to Elmer Scott, trustee, for the benefit of the Civic Federation of Dallas, $5,000; to the Endowment Fund of the American Legion, National Organization, $1,000. These bequests to be paid out of the general estate of testator. The remaining books of his library to some public, or semi-public institution, as may be selected by his executor and trustee. The testator then provides: "The balance of my estate I will and bequeath to Southern Methodist University of Dallas, Texas. And I direct that there be a Committee consisting of Bishop Charles C. Selecman, Frank McNeny and Marvin Cullum, which Committee shall determine how this bequest may be of greatest value to Southern Methodist University * * *", and then directed that: "If necessary to carry out any of the bequests or provisions of this Will, my Trustee herein named is empowered and directed to sell all my property, real, personal and mixed, and convert my entire estate into cash, as soon as, in his judgment, such sales can be effected without loss or sacrifice, and my said Trustee is expressly authorized and empowered to sell my Northaven Farms where I now live in its entirety or in tracts and parcels from time to time, as in his judgment he shall see fit, for the purpose of realizing the greatest sum therefrom; and he is further expressly authorized and empowered to operate, rent or lease said farm, or any unsold part thereof, until such time or times as my said Trustee shall in his judgment finally

dispose of all said lands, or deliver them to my residuary legatee. Such sale or sales of my said estate shall be made upon such terms and conditions, including sales for cash or credit or both, as my Trustee shall in his judgment see fit. The original Trustee and each successor Trustee, while acting as such under this Will, shall have power to collect, receipt for, invest, re-invest, loan convert, and reconvert, sell, mortgage, improve, lease and control all and every part of the trust estate. He shall have power to execute and deliver all deeds, conveyances, transfers, licenses, assignments, leases, contracts or written instruments of any and every kind. He shall pay to himself all reasonable expenses of the trust estate and his own lawful expenses as Trustee, and his own lawful and reasonable compensation for his services as Trustee. No person having business with the Trustee shall be required to look to the application of any money, property or other things of value. In the exercise of the powers given or in the discharge of any duty concerning the trust estate, my Trustee is given full discretion and shall not be held responsible for any action taken, unless it is shown that he has acted in negligence or in bad faith. * * * I appoint Porter Lindsley Independent Executor of this Will. In the event of his death, resignation, refusal or inability to act, I appoint Frank McNeny as such Executor of this Will. I direct that the Executor complete his duties as such as rapidly as possible, in order that the Trustee may promptly assume his duties hereunder. I direct that no bond be required of any Executor or Trustee and that no action in the Probate Court be taken respecting my estate other than the probating of this Will and the making and returning into court of an inventory and appraisement of my estate, * * * I direct that my Executor pay to Greenwood Cemetery of Dallas, Texas, the sum necessary to maintain in perpetuity the lot in which my mother and father are now buried."

The doctrine of election has been so often defined in cases and in textbooks, and is so well understood, as to render practically valueless as authorities, the great number of cases cited in the briefs of counsel, as, in each of the cases cited, the decision turned on the peculiar provisions of the will then under consideration. So, in determining whether the devises and bequests to the wife in the instant case were intended to be in lieu of her homestead and personal property rights under the law, resort must be had to the language of the will, and, in doing so, we are to be guided by the well-established rules of construction announced by the courts. One of the cardinal rules is that, a devise or bequest by a husband to his wife is presumed to be in addition to, rather than in lieu of, her homestead, or other legal rights, unless it clearly appears that the benefits under the will were intended to be in lieu of her legal rights. This presumption obtains because the wife owns, in her own right, certain interests in her husband's estate, of which she cannot be deprived by bequests in the nature of gratuities, as gratuities cannot be given the effect of extinguishing a legal right. See In re Hatch's Estate, 62 Vt. 300, 18 A. 814, 22 Am.St.Rep. 109. In Carroll v. Carroll, 20 Tex. 731, 732, 734, our Supreme Court used the following language in point; it said: "A bequest to the wife is a voluntary gift, and does not ordinarily affect her legal right. (2 J.C.R. 452.) We are of opinion that the terms of the will do not manifest an intention to exclude the widow from her community rights, or put her to an election between that and the bequest under the will."

Colonel Lindsley knew, or at least is presumed to have known, that the instant his will became effective, the legal rights of his widow, to the homestead and other exemptions, became fixed; also knew, or is presumed to have known, that he was powerless to deprive his widow of these rights. Of course, he could make devises and bequests intended to be in lieu of her homestead and other legal rights, and thus put her to an election, but his intention to do so must appear, explicitly and conclusively, from the language of the will. It is not enough that it may be construed as revealing such an intention; it must appear that the language of the testator is open to no other construction. The testator could, so easily, have made the devises and bequests to his wife, conditioned upon the relinquishment of her legal rights, but he did nothing of the kind. Knowing that, at his death, his estate would only own a partial interest in the homestead tract, that is, the right to possess, use, and dispose of same, after the death of his widow, or on her abandonment of same, we do not think it can be presumed, from the general language employed in paragraph 4 of the will, by which the testator devised and be-

queathed "all my estate, real, personal and mixed" in trust, etc., and similar general language, directing the trustee "to sell all my property, real, personal and mixed" and "to sell my Northaven Farms where I now live in its entirety or in tracts and parcels * * * and to operate, rent or lease the farm, or any unsold part," that the testator intended to dispose of any interest in the land and properties his estate would not have owned, or be entitled to possess at the time of his death, that is, his widow's legal rights. The presumption is that he had no such intention, because it will not be presumed that he would attempt a testamentary disposition of property or property rights he had no right to dispose of.

█ The conclusions just stated are amply supported by the authorities, notably by the doctrine announced by Chief Justice Phillips in Avery v. Johnson, 108 Tex. 294, 301, 192 S.W. 542, 544, in part, as follows; he said: "Where a testator owns a partial interest in land and the disposal of the land is the subject of his will, it is only where the intention to treat and devise the entire land as his own is revealed by clear and unequivocal language that the will is to be construed as the disposition of more than his own interest, putting the co-owner of the land to his election whether he will take under it because of its conferring upon him, by other provisions, some benefit from the testator's estate which, but for the will, he would not receive. The law presumes that no man will attempt a testamentary disposition of the property of others. It deprives no man of his property merely by conjecture. Therefore, for a will to be given the effect of an attempted disposition of property not owned by the testator, it is required that the language of the will conclusively evidence such a purpose. In such cases it is not sufficient that the will may be construed as revealing such an intention. It is necessary that it be open to no other construction. Carroll v. Carroll, 20 Tex. [731] 732; Moss v. Helsey, 60 Tex. 426; Rogers v. Trevathan, 67 Tex. 406, 3 S.W. 569; Haley v. Gatewood, 74 Tex. 281, 12 S.W. 25; Smith v. Butler, 85 Tex. 126, 19 S.W. 1083; 2 Underhill on Wills, § 730; 1 Pomeroy's Eq.Jur. §§ 488, 489; Penn v. Guggenheimer, 76 Va. 839; Havens v. Sackett, 15 N. Y. 365; Pratt v. Douglas, 38 N.J.Eq. 516; Miller v. Thurgood, 33 Beavan's Reports, 496. * * * Generally when the testator has an undivided interest in certain property, and he employs general words in disposing of it, as 'all my lands,' or 'all my estate,' no case of election arises from it; for it does not plainly appear that he meant to dispose of anything but what was strictly his own. 2 Story, E.J. § 1087; Pomeroy, § 489." We think the doctrine announced by Chief Justice Phillips is so pertinent, conclusive, and well sustained by authorities, as to settle this controversy in favor of the appellant. As the testator did not see fit to provide that the devises and bequests to his wife were to be in lieu of her homestead and personal property rights under the law, she is not required to elect, unless, as said by Chief Justice Phillips, the language of the will conclusively evidences such a purpose on the part of the testator, and is open to no other construction. The will contains no such conclusive language, or any language showing that Col. Lindsley intended to require his widow to choose between the will and her rights under the Constitution and statutes of the state.

The contention is made that the devises and bequests to the wife are inconsistent with her legal rights, therefore, she is put to an election. A careful reading of the will fails to disclose any such inconsistency. The wife was given $25,000 in money, a fee-simple title to 20 acres of land out of the 491-acre tract (Northaven Farm), to be selected by her, subject to the approval of Porter Lindsley, and a fee-simple title to a parcel of land, 200 x 200 feet, upon which the family residence and certain outhouses are situated, being part of the 200-acre rural homestead. Obviously, the gift of $25,000 and the isolated tract of 20 acres of land are not in conflict with the wife's right under the law to the rural homestead; and the gift of the fee-simple title to the parcel of land, 200 x 200 feet, upon which the residence is situated, already part of the rural homestead, is in harmony, rather than inconsistent, with her right to use and occupy the 200-acre tract as a homestead.

The contention is also made that the language of the will, wherein the testator directed the trustee, if necessary, to sell and convert into cash all property, real, personal and mixed, belonging to the estate, and "is expressly authorized and empowered to sell my Northaven Farms where I now live in its entirety or in tracts and parcels," etc., conclusively shows that the intention of the testator was to put his wid-

ow to an election. We do not think the general language employed should be given that construction. By other provisions, the testator devised to his wife, in fee, 20 acres and the small parcel, 200 x 200 feet, upon which the improvements are located; to Porter Lindsley, 50 acres, and to Charles McKamy 10 acres, aggregating about 81 acres out of Northhaven Farm, of 491 acres. Obviously, the general language was not intended to apply to the Northaven Farm in its entirety, in view of the special bequest of 81 acres; or immediately to the homestead, which the trustee could not legally possess or dispose of until the widow's life estate ended; therefore, the language in question must be harmonized with other provisions of the will and with the homestead right of the widow.

Neither do we think the testamentary scheme will be disturbed or defeated, if the homestead and other exemptions, as well as the benefactions provided in the will, are set apart to the widow. Obviously, the full realization of the objects and purposes of the testator, with reference to the 200-acre tract, constituting the rural homestead, will be postponed but not defeated, as the trustee would not have the right to possess or dispose of this part of the property until the widow's homestead right ended by death or abandonment. However, after deducting 81 acres, devised in fee simple to the several parties named, and the 200-acre rural homestead, there remain about 210 acres of the Northaven Farm, which can immediately be possessed by the trustee, and, with reference to which, the trust executed.

The contention that the widow is put to an election, in our opinion, rests upon conjecture rather than upon a proper construction of the will under well-established rules. The will contains no language conclusively evidencing such a purpose, nor can it be said that the language is open to no other reasonable construction. Obviously, the contention is based upon general language, from which, as repeatedly held, "no case of election arises," as said in Gulf, C. & S. F. Ry. Co. v. Brandenburg, Tex.Civ.App., 167 S.W. 170, 172: "Where the language used is ambiguous and leaves it uncertain as to whether the testator is referring only to his own interest or intends to include that which belongs to his wife, the instrument should be considered as referring to that interest which the testator might lawfully dispose of."

There are other considerations, which, to say the least, are consistent with the idea that Col. Lindsley did not intend to put his widow to an election between the devises and bequests and her constitutional and statutory rights. It is rather significant that nowhere does he mention the homestead in testamentary language, referring to it incidentally merely for the purpose of identifying other properties devised. In paragraph 7, the testator said, "I direct that the Executor complete his duties as such as rapidly as possible, in order that the Trustee may promptly assume his duties hereunder." The only duties specifically imposed upon the executor by the testator were to promptly pay his debts and funeral expenses; have his remains interred in Arlington National Cemetery, at Washington, and pay all estate and inheritance taxes. As it was not necessary for him to do so, the testator did not direct the executor to perform duties prescribed by law, one of which was to set apart for the widow the homestead and other exemptions which, properly, can only be performed in the course of administration. See Art. 3485, R.C.S.; 13 T.J. p. 771, Sec. 193, and authorities cited. The exemptions never came into the possession of the executor for any purpose other than to see that they were set apart for the use and benefit of the widow.

Again, I think it altogether unreasonable to assume that a man of Col. Lindsley's eminence and wealth would have left his widow inadequately supplied with means to maintain herself in the station in life they occupied. As is well known to the public, the court also knows that Col. Lindsley not only attained local prominence, but national fame as well, being the first elected head of the American Legion, a national organization. It was this eminence that justified the request that his remains be interred in Arlington National Cemetery, at Washington; otherwise, such a suggestion would have been presumptuous. With ample wealth for the purpose, as revealed by generous gifts to friends and liberal provisions for educational and benevolent purposes, we think it unreasonable to assume that such a public-spirited, generous man, would have been so unmindful of the future of his widow as to leave her without adequate means. She alleged that the

benefactions provided in the will are inadequate for her support. On this hearing, the allegation must be accorded its full face value; but aside from that, we think the conclusion inescapable that, if the widow is required to choose between the will and her legal rights, whatever her choice may be, under present conditions, the property received will be inadequate to maintain her in the station in which she and her husband moved before his death, and in which, no doubt, he desired she should be maintained after his death.

So, for the reasons hereinbefore stated, the majority, being of opinion that the widow was not put to an election, that she is entitled to the devises and bequests of her husband's will, also to her homestead and other rights under the Constitution and laws of the state, think the court erred in sustaining the demurrers and dismissing the cause. The judgment below is reversed and the cause remanded for further proceedings in harmony herewith.

Reversed and remanded.

DODD, Special Justice.

I concur with Associate Justice LOONEY in the conclusion that the cause should be reversed and remanded. My approach is somewhat different.

Because of the rare opportunity afforded and my regard for the firm conviction of Chief Justice BOND and his ripe and rich experience on the bench, both as a trial judge and as a member of this court, and, because of my respect for the trial judge and the able attorneys in this case, I desire to give my views.

In the opinions written by the other members of this court, there will be found a sufficient statement from the record.

The case as presented here, is whether or not the appellant, Marguerite B. Lindsley, as the surviving widow of Colonel Henry D. Lindsley, deceased, is put to an election under the terms of her deceased husband's will. Must she choose between her right to have the independent executor set apart to her the exemptions provided by law for the surviving widow, and her right to receive the devises and legacies made to her under his will; or, is she entitled to receive both the exemptions, and the devises and legacies?

Words to which special attention is directed are italicized.

The principle underlying the doctrine of election is not statutory, but is purely equitable. The doctrine of election is generally regarded as being founded on the intention of the testator. Dakan v. Dakan, 125 Tex. 305, 83 S.W.2d 620. An election may be expressed or implied. When not expressly made, it is a question of intention from all of the facts and circumstances of the particular case. 44 Texas Jur. 871, Section 291, Jones v. Guy, 135 Tex. 398, 143 S.W.2d 906, 912.

"At common law the right of the wife to dower could not be defeated by the will of her husband, and, if she was provided for in the will in a manner *inconsistent* with her right of dower, she could elect whether she would take her dower, or surrender that right and take under the will as devisee. The spirit of our laws from the earliest days of the republic has been to make provision for the family on the death of the head thereof." Hall v. Fields, 81 Tex. 553, 17 S.W. 82, 86.

"Estate of the widow, in dower at Common Law, is somewhat analogous to that of the wife, under our system, in the community gains; and the rule is well established, that the widow cannot be excluded from her dower, unless the intention to exclude her appear by express words or *manifest implication* * * * of the will." Carroll v. Carroll, 20 Tex. 731, 732-744.

"The principle of election is, that he who accepts a benefit under a will, must adopt the whole contents of the instrument, as far as concerns him; conforming to its provisions, and renouncing every right *inconsistent* with it; as where the wife claims something under the will which will *disappoint* the will." Philleo v. Holliday, 24 Tex. 38.

There is not found in the will any express language explicitly stating that the devises and bequests made to the wife are in lieu of her rights to the exemptions. The case, therefore, presents a question of election by implication. The question is: Is it *inconsistent* for the wife to ask for both her rights of exemptions and for the benefits bestowed upon her by the will? If she be given both, will she thereby *disappoint the will?*

In cases of election by implication, especially as to community rights of the widow, it is well settled that: "Where a testator owns a *partial interest* in land and the disposal of the land is the subject of

his will, it is only where the intention to treat and devise the *entire land* as his own is revealed by *clear* and *unequivocal* language that the will is to be construed as the disposition of more than his own interest, putting the co-owner of the land to his election whether he will take under it because of its conferring upon him, by other provisions, some benefit from the testator's estate which, but for the will, he would not receive." Avery v. Johnson, 108 Tex. 294, 192 S.W. 542, 544, and quoted with approval in Dakan v. Dakan, supra. Haley v. Gatewood, 74 Tex. 281, 12 S.W. 25, is to the same effect.

It is quite clear, from the will, that the testator intended to dispose of his entire *estate.*

The opening paragraph of the will, after the formal part, reads, "and disposing of *my entire* estate as follows"; in paragraph 4, the testator wills "all my estate" to Porter Lindsley, in trust, for the "uses and purposes, as follows"; and in paragraph 5 the testator directs, "if necessary to carry out any of the bequests or provisions of this will, my trustee herein named is empowered and directed to sell all *my* property", including "*my* Northaven Farms where I now live in its entirety." Such language, however, includes only what was strictly his own. Avery v. Johnson, supra.

It does not clearly and conclusively appear from the whole will that the testator excluded the widow's right, or interest, or estate, in a 200-acre homestead, nor in all the exempted personal property, not specifically disposed of.

Their is a difference between the rights of the widow to a homestead, from her rights to the other exemptions. The statutes made a difference. In determining whether an estate is solvent or insolvent, the exempted property, including the homestead, shall not be estimated or considered "as assets of the estate"; but, if upon settlement, the estate proves to be solvent, exempted property, "except the homestead", shall be subject to partition and distribution. Arts. 3493 to 3496.

In the next place, a difference is noted in the will. A specific bequest is made of the testator's library by giving the trustee specific directions how it is to be disposed of, after the widow has selected fifty volumes therefrom. Specific directions are also given concerning certain insurance policies. It would be inconsistent for the widow to claim these articles so specifically

disposed of, and it would dissappoint the will to permit her to have these under her claim of exemptions.

In cases where the testator has, by the terms of his will, made disposition of the whole title by segregation of specific property, it necessarily implies that the lesser title or interest held or claimed by another is excluded therefrom. Such are the cases of Dakan v. Dakan, supra; Baldwin v. Baldwin, 134 Tex. 428, 135 S.W.2d 92.

But as to the 491 acres of land, there is a different situation. From the appellant's pleadings, it appears that the whole 491 acres were of the same general character, and there could be carved therefrom a 200-acre homestead without interfering with the 50 acres willed to Porter Lindsley and the 10 acres willed to Charles McKamy. These are the only two tracts, besides the land given the widow, which are specifically appropriated and segregated. They are not definitely located, but there is a general description given so they can be described when selected by Porter Lindsley and Charles McKamy, and it does not appear that this general description conflicts with 200 acres selected by the widow. At least the face of the pleadings do not show an irreconcilable conflict. But because the 50 and 10-acre tracts are so appropriated and segregated, that fact alone does not show conclusively that 200 acres could not be appropriated out of the remainder to make up a complete homestead.

Paragraph 3 of the will reads as follows: "I direct that my estate pay all estate and inheritance tax, to the end that all beneficiaries under this will take undiminished the *gifts* made by them by this will."

The word "gifts" is italicized, because, in Carroll v. Carroll, supra, the Supreme Court said: "Every bequest imports a bounty, and is not, unconnected with other circumstances, to be taken as a satisfaction of a pre-existing incumbrance. A bequest to the wife is a voluntary gift, and does not ordinarily affect her legal right." The testator in his will uses the word "gifts". Clearly all the beneficiaries, not counting the members of the testator's family, were made "gifts". He made "gifts" to his children and grandchild. Why, then, should it be said that the benefits to his wife were in lieu of what she was entitled to by law? Merely because the "gifts" to her are large is no reason not to call them "gifts". This is but evidence of his devotion and affec-

tion, naturally flowing from a big hearted man. The will does not clearly and conclusively exclude her from the right to use and occupy a full 200-acre homestead.

But the homestead of 200 acres necessarily includes the residence. The pleadings show that the Northaven Farms, consisting of 491 acres, is not in a town or city, and that the testator and the appellant, as husband and wife, had their residence thereon at the time the will was made and at the time of his death. No written designation of the homestead had been made by the testator during his lifetime, setting forth the boundaries thereof, as he had a right to do under Article 3841 et seq. of the Statutes. Therefore, as the surviving widow, upon his death, in the absence of the question of election, she had the right to make the selection. In his lifetime he could not exclude from the homestead property "indispensable to the home". Hanes v. Hanes, Tex.Com.App., 239 S.W. 190, 191, and authorities there cited. This "indispensable" part of the homestead would include the tract of 200 x 200 feet, given to appellant in fee, on which is located the residence and garage. The "gift" to her of a stronger title than she otherwise would be entitled to in this tract of 200 x 200 feet does not exclude the right to use enough of the 491 acres to make up the 200 acres.

The Constitution, Art. 16, Sec. 52, Vernon's Ann.St., says that the homestead "shall not be partitioned". In Hall v. Fields, supra, the court said: "We know of no law which would authorize the setting apart of a portion of the homestead, and do not so construe the constitution. It is treated as an entirety, and is not subject to partition." And in Carter v. Randolph, 47 Tex. 376, 380, our Supreme Court said: "Being the homestead of the family, consisting of husband and wife, upon the death of the husband, the wife surviving, it is declared by the statute to be no part of the estate of the deceased husband. It follows, as a necessary consequence, that it remains the homestead of the wife. * * * Under the general tenor of our decisions, it must be held that it will continue to be her homestead as long as she needs and uses it for that purpose."

The widow, of course, is not entitled to two homes. Such is the effect of the holding in Ellis v. Scott, Tex.Civ.App., 58 S. W.2d 194.

In the cases of Dunn v. Vinyard, Tex. Com.App., 251 S.W. 1043, and Bumpass v. Johnson, Tex.Com.App., 285 S.W. 272, there was express language in the wills, putting the wife to an election. In the case of Rogers v. Trevathan, 67 Tex. 406, 3 S.W. 569; and also in Upson v. Fitzgerald, 129 Tex. 211, 103 S.W.2d 147; Edsall v. Hutchings, Tex.Civ.App., 143 S.W.2d 700; and Cheatham v. Mann, Tex.Civ.App., 133 S.W.2d 264, there was specific appropriation of property by the testators in their wills which excluded the right of the co-owners therein. But in none of those cases was the surviving widow's rights to have a homestead set apart to her defeated by force of the doctrine of election alone.

If the will does not state that its provisions for the widow are in lieu of homestead, it has been held that an election to take under the will does not deprive her of the homestead, unless it clearly appears from the will that such was the intention of the testator. 29 C.J. 999, Section 483; 69 C.J. 1103.

Under the terms of Colonel Lindsley's will, Porter Lindsley had two capacities. He was named as independent executor, and as trustee. Article 3314 of the Statutes, gives to him the duty as independent executor to recover possession of and hold the estate in trust to be disposed of in accordance with law. But there is excepted from his right of possession the property exempted by law. In his capacity as executor he takes the possession of the estate *as it existed* at the death of the testator. The title to the estate of the testator which vested immediately upon the death of the testator in Porter Lindsley, as trustee, was subject to the provisions of this statute as well as others governing administration of estates, and the provisions of the Constitution.

In acting as independent executor he was clothed with the duty to set apart the exemptions which rests upon the Probate Court in a case where the executor is not independent. Runnels v. Runnels, 27 Tex. 515; Roy v. Whitaker, 92 Tex. 346, 48 S. W. 892, 49 S.W. 367; Carlton v. Goebler, 94 Tex. 93, 97, 58 S.W. 829.

This leads us to the question: What is a person's disposable estate? The allowances for the widow and minor children are independent of the will. Woolley v. Sullivan, 92 Tex. 28, 45 S.W. 377, 46 S.W. 629. Article 8282 gives to a person the right to dispose of all of his property by will "subject to the limitations prescribed by law". The right of the minor children and the

widow to a homestead guaranteed by the Constitution "is a limitation prescribed by law" and cannot be taken away by a will. See Hall v. Fields, supra.

In Dakan v. Dakan, supra, it is stated that the homestead right is not an estate, but on equally as good authority it is held that a homestead right under the Constitution is an estate. Chief Justice Cureton in Woods v. Alvarado State Bank, 118 Tex. 586, 19 S.W.2d 35, after reviewing the history and many decisions on homestead rights of the survivor, declares that it is an estate. So does Justice Critz in Sargeant v. Sargeant, 118 Tex. 343, 15 S.W.2d 589, at page 593. To the same effect are the cases of Cocke v. Conquest, 120 Tex. 43, 35 S.W.2d 673, 678 and Petrus v. Cage Bros., Tex.Civ.App., 128 S.W.2d 537, 538.

This court, in two cases, rather recently has said that the homestead rights could not be disturbed by a will. Buckner v. Buckner, Tex.Civ.App., 51 S.W.2d 769; White v. Sparks, Tex.Civ.App., 118 S.W.2d 649, 651. The command of the Constitution, Article 16, Section 52, is that it shall not be partitioned during the life of the surviving spouse or so long as the survivor elects to use it as a home.

In Scoby v. Sweatt, 28 Tex. 713, a testator disposed of all his property, worth about $60,000, by will, bequeathing to a grandson $1,200 cash and a slave. This was less than what the grandson was entitled to under the old forced heirship law. This law, in effect, provided that a man could not dispose of more than one-fourth of his property by will, in event the testator left children or their descendants surviving. The grandson sued to recover his share allowed him under this law. Defendants contended that plaintiff was put to his election, and as he had received the $1,200 bequeathed to him he should not recover any more. The Supreme Court overruled this contention, and held that his right to recover his portion, fixed by law, could not be defeated by the will, and he was not put to his election.

In view of the language in Article 3495 of the Statutes, which says that the homestead shall not be considered as assets of the estate, and of the foregoing authorities holding that the homestead right of a surviving spouse is an estate, the homestead rights of appellant were unaffected. The absence of clear and unequivocal language from the will showing an intent that the bequests and devises to the wife were made in lieu of the homestead, the appellant was not required to give up her right to use and occupy a complete 200-acre homestead in order to receive the "gifts" to her under the will.

Hence, I am of the opinion that the trial court erred in sustaining the demurrer upon the theory that the wife was put to her election.

BOND, Chief Justice (dissenting).

I am not in accord with the opinion of the majority in reversing and, in effect, rendering this cause in favor of appellee. The will of Henry D. Lindsley, viewed from its four corners and giving effect to its terms as expressive of the testator's intention, undoubtedly requires his widow, Marguerite B. Lindsley, to elect whether she will accept under the will, or denounce the will and take a homestead interest in 200 acres of land, including the residence and exempt personal property. I am not averse to the law pronounced in the original opinion of Justice LOONEY, nor, in the main (where applicable here), the concurring opinion of Justice DODD. The law on wills and elections between vested rights is well understood and, manifestly, adjudicated cases furnish little or no criterion as canons for construction of other wills couched in different phraseology.

Plaintiff's petition affirmatively alleges that all the land and personal property devised by the will of Henry D. Lindsley was the separate property of the deceased, and clearly evinces her intention to take under the will all the devises and bequests vested in her by its terms, and to have set aside to her for life, a 200-acre homestead exemption and exempt personal property vested in her only after the death of her husband.

The will and codicil are set out in the petition. The trial court, in sustaining the demurrers, held in effect that appellant, by her pleadings and under the terms of the will, is put to an election, either to take under the provisions of the will, or to renounce the will and take the homestead and exempt personal property rights allowed her by law; that she cannot take both. This is the dominant question presented on this appeal.

The material parts of the will read as follows:

4. "I give, devise and bequeath in trust to Porter Lindsley of Dallas, Texas, as Trustee, and his successor trustee or trus-

tees, all my estate, real, personal and mixed, for the following uses and purposes:

"1. To my wife, Marguerite Lindsley, I give, devise, bequeath and instruct my Trustee to give her a deed in fee simple title, the residence in which she now lives on Northaven Road, together with all contents therein, except my library as hereinafter provided, and including the lot, about 200 x 200 feet, on which this residence and garage are now situated. And, to her my wife, Marguerite Lindsley, I leave in addition the following:

"(A) Fifty (50) books out of my library to be selected by her.

"(B) That part of the livestock now on my Northaven Farms or which may be on same at the time of my decease and described generally as follows: All chickens, turkeys, ducks, guineas, etc., all milk cows.

"(C) Ten (10) acres of land out of Northaven Farms in addition to the land on which my residence is now situated. This ten (10) acres to be selected by my wife, Marguerite Lindsley, but to be approved by Porter Lindsley.

"(D) Five Thousand ($5,000.00) Dollars in cash.

"(E) In addition to the $5,000.00 provided to be paid to my wife, Marguerite Lindsley, in cash, I leave her out of my general estate the sum of Twenty Thousand ($20,000.00) Dollars, to be paid to her at my Trustee's discretion and as my estate will permit.

"2. I direct that my Trustee shall pay to my daughter, Cadis Lindsley Vars, wife of Addison Vars, of Buffalo, New York, the sum of Twenty Five Hundred ($2,500.00) Dollars in cash.

"3. I have provided for my son, Henry D. Lindsley, Jr., the sum of Twenty Five Hundred ($2,500.00) Dollars, he being the beneficiary in a life insurance policy issued by the Praetorians of Dallas, Texas, in the sum of Twenty Five Hundred ($2,500.00) Dollars, and I direct my Trustee to deliver to him said policy of insurance, which shall constitute his interest in my estate.

"4. To Porter Lindsley I will and bequeath in fee simple that fifty (50) acres of land out of my Northaven Farms lying in a parallelogram bounded on the East side by Inwood Road, on the South side by Northaven Road, and on the West side by Welch Road, provided that he, Porter Lindsley, desires to build his permanent home on said land. In the event he does not so desire,

then this fifty (50) acres will go to my residuary legatee and Porter Lindsley will receive out of my general estate instead of said fifty (50) acres, the sum of Ten Thousand ($10,000.00) Dollars.

"When Porter Lindsley may have built a residence on said Fifty (50) acres and occupies it as a home, then all question as to permanency of title in him shall have ceased and the fifty (50) acres shall thereafter be his without any strings of any kind on it, to do with entirely as he pleases.

"5. To Charles McKamy of Carrollton, Texas, I will and bequeath ten (10) acres of land out of Northaven Farms to be selected by him, but approved by Porter Lindsley, on Northaven Road between Preston Road and Inwood Road, provided he, the said Charles McKamy desires to use said ten (10) acres for his permanent home. In the event he does not so use same, then this ten (10) acres shall revert to my residuary legatee. But Charles McKamy can commence improving this ten (10) acres for his home at any time he pleases within five (5) years from my decease.

"6. I direct that my Trustee shall pay to Miss Ella V. Freeman of Dallas, Texas, long my valued and efficient secretary the sum of One Thousand ($1,000.00) Dollars in cash.

"7. I direct that my Trustee shall pay to the Salvation Army the sum of Five Thousand ($5,000.00) Dollars, to be used as it may desire in connection with its work in Dallas County, Texas. This bequest shall be paid out of the general proceeds of my estate.

"8. I direct that my Trustee shall pay to the Scottish Rite Crippled Children's Hospital of Dallas, Texas, the sum of Ten Thousand ($10,000.00) Dollars, to be paid out of my general estate.

"9. I direct that my Trustee shall pay to Elmer Scott, Trustee, the sum of Five Thousand ($5,000.00) Dollars to be used at his discretion for the Civic Federation of Dallas and in the event Elmer Scott does not desire to so use this sum, it shall revert to my general estate.

"10. I direct that my Trustee shall pay to the Endowment Fund of the American Legion, the National Organization, the sum of One Thousand ($1,000.00), to be paid out of my general estate.

"11. The balance of my books, after the fifty (50) are taken by my wife, as provided in Paragraph 5, Section 4, I desire to go

to some public or semi-public institution, as shall be selected by Porter Lindsley, my Executor and Trustee.

"12. In the event my Trustee shall determine that my library shall go to the Carrollton and Farmers Branch Community, then I direct that there be paid One Thousand ($1,000.00) Dollars out of my general estate to Charles McKamy and Tom Field, Trustees, to be used as they may deem proper in connection with the most beneficial use of this library.

"13. The balance of my estate I will and bequeath to Southern Methodist University of Dallas, Texas.

"And I direct that there be a Committee consisting of Bishop Charles C. Selecman, Frank McNeny and Marvin Cullum, which Committee shall determine how this bequest may be of greatest value to Southern Methodist University

"That is, whether it go to the general endowment fund of the University, or to a special endowment fund of the University, or for the erection of one or more buildings for the University, or whether it go in whole or part for scholarships to the University.

"It is my desire, but this Committee is not bound by this desire, that at least four (4) scholarships—(2) for boys and two (2) for girls—be provided in my name at said University in perpetuity."

5. "If necessary to carry out any of the bequests or provisions of this will, my Trustee herein named is empowered and directed to sell all my property, real, personal and mixed, and convert my entire estate into cash, as soon as, in his judgment, such sales can be effected without loss or sacrifice, and my said Trustee is expressly authorized and empowered to sell my Northaven Farms where I now live in its entirety or in tracts and parcels from time to time, as in his judgment he shall see fit, for the purpose of realizing the greatest sum therefrom; and he is further expressly authorized and empowered to operate, rent or lease said farm, or any unsold part thereof, until such time or times as my said Trustee shall in his judgment finally dispose of all said lands, or deliver them to my residuary legatee. Such sale or sales of my said estate shall be made upon such terms and conditions, including sales for cash or credit or both, as my Trustee shall in his judgment see fit.

"The original Trustee and each successor Trustee, while acting as such under this Will, shall have power to collect, receipt for, invest, re-invest, loan convert and reconvert, sell, mortgage, improve, lease and control all and every part of the trust estate. He shall have power to execute and deliver all deeds, conveyances, transfers, licenses, assignments, leases, contracts or written instruments of any and every kind. He shall pay to himself all reasonable expenses of the trust estate and his own lawful expenses as Trustee, and his own lawful and reasonable compensation for his services as Trustee. No person having business with the Trustee shall be required to look to the application of any money, property or other things of value. In the exercise of the powers given or in the discharge of any duty concerning the trust estate, my Trustee is given full discretion and shall not be held responsible for any action taken, unless it is shown that he has acted in negligence or in bad faith."

An analysis of the will of Henry D. Lindsley shows that he intended to dispose of his entire property. True, he could not dispose of his wife's rights, present or future, in the property, but he could, by will, put her to an election to accept thereunder or renounce it. The language employed by the deceased must be given the meaning intended by him, judged in the light of attending circumstances. Of course, he made the will in his lifetime; he owned the property in its entirety; it was his property. The wife, at the time he made the will, had only a defeasible interest or right in the property; thus, such terms as "my property," "all my estate," "my library," "my Northaven Farms," "my residence," can have no meaning other than that he was dealing with the whole of the property. It is true, a right conferred by law upon a surviving spouse, in property of the decedent, may not be abridged by the will of the latter; yet, if the property in its entirety is devised by the decedent, and the surviving spouse is given a benefit under the will, she is not thereby deprived of her rights in the property, but is put to an election as to whether she will accept all conditions of the instrument, so far as it concerns her, and renounce every right inconsistent therewith.

It will be presumed that the testator knew the extent of his ownership in the property; knew his rights and understood the nature of his wife's interest in his estate. Thus, unless there is language to indicate a contrary intention, it must be held that, in the

use of the terms·"my property," "all my estate," etc., the testator was dealing with the property in its entirety, without limitations or restrictions. Such language is descriptive of the property he owned at the time of the execution of the will, and should be considered as referring to the interest the testator owned and might lawfully dispose of.

Article 4 of the will makes disposition of testator's entire estate, both real and personal; it says: "I give, devise and bequeath in trust to Porter Lindsley of Dallas, Texas, as Trustee, and· his successor trustee or trustees, *all my estate, real, personal and mixed,* for the following uses and purposes:" (Italicized for emphasis.) (Here follow the bequests which the trustee is directed to carry out).

(1) To his wife: (a) Deed in fee-simple title to the residence in which she lives on Northaven Road, together with all contents therein, except his library; (b) fifty books out of "my library"; (c) all livestock on "my Northaven Farms"; (d) 10 acres of land out of Northaven Farms, in addition to the land on which "my residence is now situated." (The codicil increases this to 20 acres); (e) $5,000 in cash; (f) $20,000 to be paid to her out of "my general estate." (2) To his daughter, Cadis Lindsley Vars, $2,500 (increased by codicil to $12,500). (3) To his son, $2,500 in cash. (4) To Porter Lindsley 50 acres of land out of "my Northaven Farms". (5) To Charles McKamy, 10 acres out of Northaven Farms. (6) To Miss Ella V. Freeman $1,000. (7) To the Salvation Army $5,000. (8) To Scottish Rite Crippled Children's Hospital, of Dallas, Texas, $10,000. (9) To Elmer Scott $5,000. (10) To Endowment Fund of the American Legion, $1,000. (11) To some public or semi-public institution the balance of "my library" after fifty books are taken by his wife. (12) To Southern Methodist University, "all the residue of my estate." Under Article 5 of his will, the testator said: "If necessary to carry out any of the bequests or provisions of this Will, my Trustee herein named is empowered and directed to sell *all my property, real, personal and mixed,* and convert my entire estate into cash, as soon as, in his judgment, such sales can be effected without loss or sacrifice, and my said Trustee is expressly authorized and empowered to sell *my Northaven Farms where I now live in its entirety* or in tracts and parcels from time to time, as in his judgment he shall, see fit, for the purpose of realizing the greatest sum therefrom; and he is further expressly authorized and empowered to *operate, rent* or *lease said farm,* or any unsold part thereof, until such time or times as my said Trustee shall in his· judgment finally dispose of *all said lands, or deliver them to my residuary legatee.* (Southern Methodist University) Such sale or sales of my said estate shall be made upon such terms and conditions, including sales for cash or credit or both, as my Trustee shall in his judgment see fit." (Italicized for emphasis.)

The language of the will,—a devise or bequest of "my property," a direction to his trustee to sell "all my property, real, personal and mixed," expressly authorizing the trustee "to sell my Northaven Farms where I now live in its entirety" and "to operate, rent or lease said farm, or any unsold part thereof, until such time or times as my said trustee shall in his judgment finally dispose of *all said lands,* or deliver them to my residuary legatee," can be construed only that he was making disposition of the property in its entirety. Can it be said, from the language employed, that the testator desired to sell the Northaven Farms, or deliver all said lands to Southern Methodist University, or to operate, rent or lease said farms encumbered with appellant's homestead right in 200 acres thereof? There can be no doubt that the testator treated the property as his own, and clearly devised his entire estate, regardless of any right or claim his wife might have or acquire therein.

The will bequeaths property to the wife which she would not receive but for the will, and takes from her rights in the property vested by law, thus imposing upon her the necessity of making an election to either take under the will or renounce the devise or bequest and preserve her rights in 200 acres, and the exempt personal property. The Supreme Court, in the case of Philleo v. Holliday, 24 Tex. 38, announced the following rule relative to elections under a will: "The principle of election is, that he who accepts a benefit under a will, must adopt the whole contents of the instrument, so far as it concerns him; conforming to its provisions, and renouncing every right inconsistent with it; as where the wife claims something under the will which will disappoint the will." Dakan v. Dakan, 125 Tex. 305, 83 S.W.2d 620; Smith v. Butler, 85 Tex. 126, 19 S.W. 1083; Dunn v. Vinyard, Tex.Com.App., 251 S.W. 1043;

Upson v. Fitzgerald, 129 Tex. 211, 103 S. W.2d 147; Cheatham v. Mann, Tex.Civ. App., 133 S.W.2d 264. Also, in Dunn v. Vinyard, supra [251 S.W. 1046], the general and controlling principles of the doctrine of election are fully and clearly set out: "The doctrine of election under a will is too familiar to require a general discussion. Briefly it may be said that where one has a valid claim to property which is disposed of by will (as in the case of the surviving wife in community property), in violation of such right, and at the same time other property to which the claimant would not be entitled is devised to the claimant, an election becomes necessary. In other words, an election means that a legatee or devisee under a will is put to the choice of accepting the beneficial interest offered by the donor in lieu of some estate which he is entitled to, but which is being taken from him by the terms of the will. When by the express terms of the will the party is put to an election, he must make a choice regardless of the relative value of the two inconsistent rights. To uphold an election the compensating thing need not be of value equal to that taken away. Smith v. Butler, 85 Tex. [126] 130, 19 S.W. 1083."

The wife's claim of homestead rights in 200 acres of the Northaven Farms and the exempt personal property would undoubtedly disappoint the will. The language employed in the will, disposing of all his estate to a trustee for the purposes designated by him, is in violation of the surviving wife's rights. How may the trustee, if necessary to carry out the trust, sell and convert all the estate into cash, sell the Northaven Farms in its entirety, "operate, rent or lease said farm, or any unsold part thereof," or deliver the unsold, undevised lands to Southern Methodist University, encumbered with the rights and possession of the wife? Henry D. Lindsley had the right to make his own will, employing such language as he desired to carry out his bequests. True, he might have said, "I give all this to my wife in lieu of her homestead and exempt property," or some similar expression; but, forsooth, he did not do so. Shall the testator's will, clear and unambiguous—because the language employed failed to meet the exalted notion of some judge or court—be not tested by his language? The testator's language must be given the effect intended by him, regardless of form. Manifestly, the testator intended to give his wife *the* homestead, saying in his will: "To my wife,

Marguerite Lindsley, I givem devise, bequeath and instruct my Trustee to give her a deed in fee simple title, *the residence* in which she now lives on Northaven Road, together with all contents therein, except my library as hereinafter provided, and including the lot, about 200 x 200 feet, on which this residence and garage are now situated." This was Henry D. Lindsley's homestead; he had a right to designate and limit the extent of it; he had a right to give it to his wife; he did so. The terms in the will, "the residence * * * lot, about 200 x 200 feet," in which she lives on Northaven Road, are synonymous with the term "the homestead"; and, as used in the homestead exemption laws, has invariably been construed as meaning a homestead,—a house, or dwelling place. The "residence" devised, limited to "the lot, about 200 x 200 feet," excludes the idea that the testator intended to allow her to also claim another residence or homestead in 200 acres adjacent thereto. The limitation in the devise is significant: A devise of the residence carries with it the dwelling place, with adjoining land used in connection therewith. So, without the limitation, the residence being on Northaven Farms, the devise would have included the entire tract. The limitation curbed the widow's further right in the adjacent lands. She could not, after the death of the husband, select from the estate another homestead without denouncing the gift of the designated homestead.

Then too, Henry D. Lindsley gave his wife, in addition to the residence (par. 1, sec. C) "Ten (10) acres of land (increased to 20 acres by the codicil) out of Northaven Farms *in addition to the land on which my residence is now situated.* This ten (10) acres," he says, "to be selected by my wife, Marguerite Lindsley, but to be approved by Porter Lindsley"; he also gave Porter Lindsley (par. 4) 50 acres with designated bounds; and to Charles McKamy (par. 5) 10 acres to be selected by him, but approved by Porter Lindsley. It will be noticed that at no place in the will does the testator mention his wife's right to a homestead of 200 acres out of Northaven Farms, or that Porter Lindsley, Charles McKamy and his wife shall select their bequests with reference to such a homestead. It cannot be presumed that Henry D. Lindsley, a man of rare ability and extensive experience in the handling of estates and conveyances, did not know

that his wife could select her endowed homestead. Undoubtedly he knew that the surviving wife, if she wished to have set aside to her a 200-acre homestead, her right of selection would be first and superior to that of Porter Lindsley and Charles McKamy. The fact that he gave Porter Lindsley the right to approve the location of these bequests, without limitation as to their location, and without reference to the wife's legal homestead rights, tends strongly to show that the testator intended that no such homestead should be accorded to her. If the testator by implication did not so intend, then she was put to an election, either to take under the will or her constitutional and statutory rights. She could not do both. In giving the wife the 20 acres "in addition to the land on which my (the) residence is now situated," the wife's rights in the Northaven Farms are clearly limited, and the idea excluded that the testator intended that his wife should also take 200 acres in addition to the devise.

Furthermore, it will be observed that the testator said (par. 13), "The balance of my estate," that is, after giving his wife and the other beneficiaries the various preceding bequests and devises, "I will and bequeath to Southern Methodist University of Dallas, Texas." It will be conceded that "my estate" has a fixed and definite legal meaning; that the property or fund vested was such as belonged to the testator, and, without more, would not refer to the wife's vested interest in the residue or remainder. But in construing the will, we must determine what property was intended to be transferred to Southern Methodist University. The intent of the testator controls. In determining the intention, we must consider all words as used in their ordinary sense and meaning. We must determine intent from the testator's standpoint, and in view of circumstances and surroundings known to him. Henry D. Lindsley knew that all the property devised was his separate estate, acquired many years before his marriage to his surviving wife, and that his wife had no present interest therein; thus, in paragraph 4 of the will, he gave Porter Lindsley, for specific designated purposes, "all my estate," and then in paragraph 5, to carry out his bequest, empowered his trustee to sell or rent, if necessary, "my entire estate." And, in the concluding paragraph he says, "I direct * * * that no action in the pro-

bate court be taken respecting my estate", etc. Viewing the will from all angles, manifestly, Henry D. Lindsley intended to pass the estate in its entirety, to enable his executor and trustee to carry out his numerous bequests. Such would be the natural and reasonable interpretation of an ordinary person, even if such term, "my estate," technically, did not include the wife's dower homestead. The technical term employed must be construed in the sense in which a man of ordinary intelligence would have employed it. At the time the will was drafted, the term "my estate" had no other meaning than the property in its entirety. He described it as the estate actually existed when he drafted the will. At that time, his wife had no legal or equitable title in his estate. The language of the testator should be given the meaning as of the time he employed it, and not when subsequent events might change its meaning.

Furthermore, the library in his home was also exempt property; the widow, under the Constitution and statutes of this State, had the right to have it set apart for her use and benefit; yet, in his will, Mr. Lindsley gave his wife fifty books out of the library, to be selected by her, and provided that the balance should go to some public, or semi-public, institution to be selected by his executor and trustee. How may the executor and trustee carry out the bequest to the wife, and then, in the absence of his wife's election, give to some public or semi-public institution the balance of his library? The wife of the deceased is a comparatively young woman, thus can it be read into the will that the testator intended that the bequests be held in trust for thirty or forty years, until the widow dies, or abandons her homestead rights? Such is untenable. Certainly the surviving wife's rights, if allowed, would disappoint the bequests; there can be no doubt that the will, upon its face, is inconsistent with the rights of the widow in the deceased's estate, necessarily putting her to an election.

I am of the opinion that the action of the trial court, in sustaining the demurrers and dismissing the suit, was correct. It is not clear from the petition that the wife has elected to take under the will, and unless she has done so, courts cannot divest her of her right to elect. It might be inferred from the record, however, that she has elected to take under the will rather than

against the will. The judgment of the court below should be affirmed.

### On Rehearing.

DODD, Special Justice.

In their motion for rehearing, appellees present two new assignments of error, which are as follows:

"It was error for the Honorable Towne Young, Associate Justice, to disqualify himself from a consideration of this case on the grounds stated in his certificate filed herein on April 16, 1941, the grounds which he assigns for his disqualification not being grounds recognized by law as legal grounds for disqualification, and, therefore, the appointment by the Governor of the Honorable Austin S. Dodd, Special Associate Justice in this case, is without force and effect."

"The Court erred in not certifying this case to the Supreme Court on certified questions, the Honorable Towne Young, Associate Justice, having forwarded to the Governor his certificate of disqualification in this case, and the other two members of this Court being unable to agree."

Section 11 of Article 5 of our State Constitution, Vernon's Ann.St., reads as follows: "No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case. When the Supreme Court, the Court of Criminal Appeals, the Court of Civil Appeals, or any member of either, shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of the State, who shall immediately commission the requisite number of persons learned in the law for the trial and determination of such cause or causes."

The record in this case shows that Associate Justice Young, after hearing argument on its original submission, determined that he "may be interested" in this case, and in accordance with the above constitutional provision, on February 12, 1941, certified to the Governor his disqualification to hear and determine this case in this court. Thereafter, the Governor issued his commission, which is in due and regular form, appointing the writer to act with the other two regular members of this court for the trial and determina-

tion of this cause in the place of Associate Justice Young, and the writer has taken the oath and qualified in the manner provided by law. On rehearing oral argument was heard upon the whole case before a full court, with the writer sitting in place of Associate Justice Young.

The manner provided by the Constitution has been followed. We hold that this court as so constituted for the trial and determination of this cause is a legal court and that the appointment by the Governor of such special associate justice in this case is not without force and effect. The identical question has heretofore been decided in accordance with our views by the Court of Civil Appeals for the Ninth District, on rehearing in the case of Boynton Lumber Company v. Houston Oil Company of Texas, 189 S.W. 749, 760, writ of error dismissed. We quote, in part, the opinion of Conley, C. J., as follows:

"The motion for rehearing in this cause was overruled on the 6th day of October, 1916. Thereafter the appellants filed a motion to vacate the judgment in this cause, and to certify the case to the Supreme Court, and the court then, of its own motion, and that it might have opportunity to investigate the questions presented in the latter motion, recalled its action in overruling the motion for rehearing. The motion to vacate the judgment is based upon the proposition that Special Associate Justice Duffie was not legally appointed, and for that reason the judgment of affirmance rendered in this cause in the original opinion was thereby wholly void, as Justice Brooke was disqualified, and as Justice Middlebrook dissented from the affirmance of the cause by Justice Duffie and Chief Justice Conley.

"When this cause was presented to the court originally, it was ascertained that Justice Brooke was recused. Associate Justice Middlebrook and Chief Justice Conley considered the cause, and could not agree as to its disposition. Thereafter a certificate to that effect, in accordance with the terms of the statute, was made and filed with the Governor, who thereupon appointed M. S. Duffie as Special Associate Justice to sit in said cause, and he thereupon duly qualified. The court being thus constituted, it again took up the consideration of the cause, and Chief Justice Conley agreed with Special Associate Justice Duffie in the majority opinion, Justice Middlebrook dissenting. We are of the opinion

that there is no merit in appellants' contention that the court, as thus constituted, was an illegal entity. * * * "

The history of the above constitutional provision is reviewed and then continuing, the Court said:

"The Constitution makes it the duty of the Governor to appoint a Special Associate Justice when any member of the Court of Civil Appeals is disqualified, while the statute says that the Governor may appoint only when the court or two members thereof are disqualified. This conflict, of course, must be resolved in favor of the Constitution. In the case of Nalle v. City of Austin, 85 Tex. [520] 539, 22 S.W. 668, 960, the court had occasion to consider a question with reference to the power of the Governor to make appointments in Courts of Civil Appeals in case of disqualification of a judge or judges, and said:

" 'Under the original section a special judge could be appointed only when two members of a court were disqualified; and hence there was no provision to meet the case when one was disqualified and the other two failed to concur as to the decision of the case. The amended section obviates this difficulty by providing for an appointment when only one is disqualified.'

"This section of the Constitution is self-executing, in that it contains within itself the means by which the right given may be enjoyed and protected, and the duty imposed enforced. Cooley, Const.Lim. (6th Ed.) p. 99. Under the above authorities, there can be no question but what Special Associate Justice Duffie was legally appointed by the Governor to sit in this cause, and that the court, as thus composed, was a duly and legally constituted court.

"There is also no merit in appellants' contention to the effect that it is incumbent on this court, because of the dissent of Justice Middlebrook, to certify this cause to the Supreme Court. The original opinion of the court shows the sole question for determination involved the location of boundary lines between lands owned by appellants and other lands owned by appellee. Therefore the case is one of boundary only, and one of which this court has final jurisdiction under the law. Article 1620, Vernon's Sayles' Texas Civil Statutes, provides:

" 'When any one of said Courts of Civil Appeals shall, in any cause or proceeding, render a decision in which any one of the judges therein sitting shall dissent as to any conclusions of law material to the decision of the case, said judge shall enter the grounds of his dissent of record; and the said Court of Civil Appeals shall, upon motion of the party to the cause, or on its own motion, certify the point or points of dissent to the Supreme Court.'

"This statute, it has been determined, does not apply to causes of which the Courts of Civil Appeals have final jurisdiction. Kidd v. Rainey, 95 Tex. 556, 68 S.W. 507; Miller v. Mosely [Tex.Civ. App.], 91 S.W. [648] 651; Herf v. James, 86 Tex. 230, 24 S.W. 396.

"Appellant also contends that it was entitled to have this case orally reargued after Justice Duffie was appointed. We do not think so. The case was regularly set on the docket for submission, and was, on the day of its submission, orally presented to the court. The presentation of any further oral argument was a matter of grace or invitation from the court, and the court not deeming the issues involved in the case of sufficient importance, or of such a nature as to require further elucidation than was obtained from appellants' arguments in the briefs, did not extend an invitation for any further oral presentation, and did not think any necessary.

"Motion for rehearing, and also motion to vacate and certify overruled."

The only distinction between the Boynton Lumber case and this case is that that was a boundary line suit, which, under the law, was made final in the Court of Civil Appeals; whereas, this case is one not made final in the Court of Civil Appeals, but the Supreme Court has jurisdiction to review on a writ of error. The Supreme Court, ever since the case of Campbell v. Wiggins, 85 Tex. 451, 22 S.W. 5, has discouraged the use of taking a case to that court by the means of certified questions of law, in cases of dissent where the Supreme Court has jurisdiction to review a case by writ of error. While Article 1852 appears to make it the duty of a Court of Civil Appeals to certify questions of law when there has been a dissenting opinion rendered, but the Supreme Court, in the case of State v. Fisher, 94 Tex. 491, 62 S.W. 540, denied the writ of mandamus to compel certifying, because the Supreme Court had jurisdiction of the case, and, if the judgment be er-

roneous, upon application to that court for a writ of error it has the power and duty to correct the error, if any, and because the parties have a plain, adequate and complete remedy by due course of law by means of writ of error.

As this court as now constituted in this case is a legal court, with three duly qualified members, we overrule the appellees' second assignment of error as hereinbefore quoted.

■■ Recurring to the matter of disqualification of a judge, the constitutional provision says: "No judge shall sit in any case wherein he may be interested". The words "may be" imply that if there be a doubt of a judge being "interested" in the case he was thereby disqualified. The doubt should be resolved in favor of disqualification rather than for the qualification of a judge. It has been so stated by Fly, C. J., of the San Antonio Court of Civil Appeals in the opinion rendered in Cotulla State Bank v. Herron, 202 S.W. 797, 798, in the following language: "The cause was tried by jury, and the testimony was quite conflicting. It is to be regretted that a judge should try a case in which there is the least ground upon which to base a claim for his disqualification, and, if an error is ever made as to disqualification, it should be in favor of the disqualification rather than against it. An independent, unbiased, disinterested, fearless judiciary is one of the bulwarks of American liberty, and nothing should be suffered to exist that would cast a doubt or shadow of suspicion upon its fairness and integrity. If there should be any evidence tending to show that J. O. Rouse had any interest in any way in the money Herron sought to collect from appellant, that issue should be presented to the jury on another trial."

■■ Other reasons why we are of the opinion that the doubt should be resolved in favor of disqualification are that enactment of the constitutional provision is a declaration of public policy and the disqualification cannot be waived, and the acts of judges subject to any constitutional disqualification are void: Chambers v. Hodges, 23 Tex. 104; Newcome v. Light, 58 Tex. 141, 44 Am.Rep. 604; Templeton v. Giddings, Tex.Sup., 12 S.W. 851; Andrews v. Beck, 23 Tex. 455; Burks v. Bennett, 62 Tex. 277; Gains v. Barr, 60 Tex. 676; Jouett v. Gunn, 13 Tex.Civ.

App. 84, 35 S.W. 194; Nona Mills Co. v. Wingate, 51 Tex.Civ.App. 609, 113 S.W. 182; Lee v. British-American Mortgage Co., 51 Tex.Civ.App. 272, 115 S.W. 320; Reeves v. State, 114 Tex. 296, 267 S.W. 666.

In the case of Collingsworth County v. Myers, Tex.Civ.App., 35 S.W. 414, 415, cited with approval by the Supreme Court, in the case of Reeves v. State, supra, it was held that a county judge could not enter a judgment dismissing himself from a suit against the county, although the objection was made that he was not a proper nor a necessary party.

The court said: "We are inclined to the opinion that Judge Small was disqualified to hear and determine this cause, or make any order therein; that he was interested therein to the extent of the costs of making him a party and serving him with citation, and this, we think, was sufficient interest to disqualify him from sitting as judge in the case for any purpose whatever."

As we view this case, it may not be necessary to decide that Judge YOUNG "may be interested" in this case, but we cannot say, as a matter of law, that he may not be interested, but we will express our views.

In the case of the City of Dallas v. Peacock, 89 Tex. 58, 33 S.W. 220, 221, our Supreme Court, speaking through Gaines, C. J., said: "The interest meant is a pecuniary interest; that is, such an interest as is capable of being valued by a pecuniary standard. The slightest interest is sufficient, provided it be immediate, and not remote and contingent. Taylor v. Williams, 26 Tex. 583. This results from the fact that there can exist no rule by which it can be determined where the line should be drawn. An amount which is too small to influence one man might be sufficient to affect another of a more parsimonious disposition. A taxpayer in a city, who is not an inhabitant of the city, has no legal relation to the municipality, except in so far as he is liable to the imposts laid upon his property for the support of the municipal government. Has he an interest in a suit for or against a city which does not involve a tax? We think not."

In the case of City of Oak Cliff v. State, 97 Tex. 391, 79 S.W. 1068, 1069, the Supreme Court expressed the matter

in a negative form, as follows: "That where a judicial officer has not so direct an interest in the cause or matter as that the result must necessarily affect him to his personal or pecuniary loss or gain * * * then he may sit."

It is the general rule that a stockholder or director in a corporation cannot sit as a judge in the action in which such corporation is interested. 33 Corpus Juris 995, Section 139. A judge who is a director of a national banking association, which requires of him, under the law, to own in his own right at least ten shares of the capital stock thereof in order to be eligible as a director, has such an interest that disqualified him from sitting as a judge in a case where such association is a party. Williams v. City National Bank, Tex.Civ.App., 27 S.W. 147. A judge who holds a benefit certificate in the Sovereign Camp W. O. W. which is a party to the suit in his court, has such interest in the case to be disqualified. Sovereign Camp, W. O. W., v. Hale, 56 Tex.Civ.App. 447, 120 S.W. 539. The case of Sovereign Camp, W. O. W., v. Ayres, 113 Tex. 564, 261 S.W. 1000, was decided by a court composed of special judges, all of the regular members of the Supreme Court having disqualified themselves in that case.

■ The interest sufficient to disqualify a judge from sitting in a case must be a direct, real and certain interest in the subject matter of the litigation, not merely indirect or incidental or remote or contingent or possible. Hubbard v. Hamilton County, 113 Tex. 547, 261 S.W. 990, 992. But Chief Justice Cureton in that case said, "the interest meant is a pecuniary interest, that is, such an interest as is capable of being valued by a pecuniary standard. The slightest interest is sufficient, provided it be immediate and not remote and contingent."

■ The record in this case shows that there was filed herein on April 16, 1941, a certificate signed by Judge YOUNG. It recites in substance, that the attorneys for appellees had called his attention to the fact that the record in this case did not show on what grounds he had certified his disqualification to the Governor, and at their request he stated therein that the Texas Scottish Rite Hospital for Crippled Children is a party to this suit; that he is a director of such charitable corporation, and, as such, actively interested in and directing its affairs. The hospital, in turn, is one of the beneficiaries under the will of Henry D. Lindsley. His associates having disagreed over a proper disposition of the case, final decision by this court would have developed upon him and that he was convinced of a personal disqualification by reason of the above connection.

Who is better able to judge his personal disqualification by reason of his connection, than Judge YOUNG himself? He is a learned judge, an able member of this court, served with credit and distinction as a district judge for a number of years, and is a man of a high sense of honor, and has a heart full of human kindness. The name of the charitable corporation of which he is a director implies that its mission is to care for crippled children. Such children pull at the heart strings of a man in such a manner that stirs the deepest human emotions and sympathy. Having been made a director of such an institution signifies that Judge YOUNG is deeply interested in the welfare of the children coming under the care of the hospital. He, as one of the directors, is charged with the duty of managing its affairs and looking after the welfare thereof. As such a director, being actively interested in and directing its affairs, he is interested in planning and carrying out the purpose and mission of said corporation. Any suit that seeks to add to or take from, or in any manner affect the resources of carrying on the work of the corporation, necessarily must enter into the plans, program and discussion of the board of directors. Therefore, we cannot say that he may not be "interested" in this action to which said corporation has been made a party and is a party on this appeal.

It may be said that the nature of this suit is not one to break the will of Henry D. Lindsley, and that the bequest mentioned in the will is not being attacked, and that it may not lose or gain by reason of this suit any pecuniary advantage. But we note from the record that this charitable corporation appeared in the trial court through its attorneys and contested the suit, and has appeared in this court through its attorneys. This is sufficient, we think, to show that persons connected with said institution, whether they be the board of directors of which Judge YOUNG is a member or others, have considered that the interest of the institution may be affected by this suit. It

may also be said that this is purely a charitable organization in which many people, especially members of the Masonic fraternity, have a common interest; but it is a private corporation, and as such is subject to the law regulating such corporations.

Therefore we hold, if such be necessary, that Judge YOUNG "may be interested" in this suit in this court.

■ But we do not deem that it is necessary for the case to turn upon such holding. We do not believe that the certificate of disqualification to the Governor and the commission appointing a special associate justice in this case by the Governor, can be questioned in the manner as herein made by appellees. We quote the following from 33 C.J. page 1038, Section 237, as follows:

"A special or substitute judge properly selected under authority of law is both a judge de facto and de jure. Where there is no legal authority for the selection of a special judge, a person so attempting to act is neither a judge de jure nor a judge de facto, and proceedings had before him are null and void. Following the rule that there cannot be a de facto officer if a de jure officer is discharging the functions of the office in question, if the regular judge is presiding and assumes to act in the particular cause, a special judge irregularly appointed, who assumes to act, is not even a de facto judge. It has been held that a statute providing for the selection of a judge pro hac vice in the emergency of the disqualification of the judge only does not create an office, and consequently, under the theory that, in order that there may be a de facto judge, there must be an office which the law recognizes, it has been held that there can be no de facto judge pro hac vice. But as a general rule, provided that the selection of a special or substitute judge is authorized by law, one who has been selected and taken possession of the office, and therefore acts under color of title, is considered as a judge de facto; his acts are not void; they are valid and binding.

"The acts of a de facto special or substitute judge cannot be overthrown in collateral attack, nor in a direct attack unless objections to his acting as judge are promptly made, except for jurisdictional defects."

We think the decision of the Supreme Court in Schultze v. McLeary, 73 Tex. 92, 11 S.W. 924, is conclusive of the legal force and effect of the certificate of disqualification to the Governor and of the Governor's commission. In that case, however, the matter of disqualification seems to have been relationship of parties to the judge, rather than interest. We quote in part from the decision as follows:

" * * * the district judge certified his disqualification to the governor, who appointed J. H. McLeary to try the cause. Under this appointment McLeary qualified, and tried the cause, but, on application for a new trial, held that the district judge was not disqualified, and that for this reason his own appointment was void. * * *

"We think the special judge appointed by the governor has full and legal power to try the cause, and we have no doubt will be willing to do so, when satisfied that his appointment was legal. We cannot treat the refusal of the special judge to try the cause as a resignation of the place to which he qualified, and, though holding by special appointment, he must be held, so long as so holding, subject to the writ prayed for as fully as would be a district judge, who, without legal cause for so doing, should refuse to proceed with the trial of a cause. The writ prayed for will therefore issue from this court, commanding the special judge to proceed with the trial of the cause named in the motion, agreeably to the principles and usages of law."

■ As the certification of disqualification to the Governor and the commission by the Governor have been done in accordance with the Constitution, the special associate justice fills a special office of a judge of this court. The Constitution prescribes a method of trial of members of this court by impeachment and by address. The method so prescribed in the Constitution appears to be the only method by which it can be legally declared that the special appointment is without legal effect and force. This is the substance of the holding of the Supreme Court in Dorenfield v. State, 123 Tex. 467, 73 S.W.2d 83. In that case the Speaker of the House of Representatives, it was held, cannot remove without trial a member of the Texas Relief Commis-

sion theretofore appointed by him, as the member of such commission was a State officer for a certain term. Where the Constitution prescribes the motion for removal of an officer, the Legislature may not authorize removal in another mode. The mode for declaring a vacancy as prescribed in the Constitution is the exclusive mode. Therefore, it must be held that the appointment by the Governor of a special justice, done in the manner as the record in this case reflects, is not without legal force and effect.

The motion for rehearing and to vacate the former opinions, and motions to certify to the Supreme Court, are all overruled.

LOONEY, J., concurs.

BOND, C. J., dissents.

BOND, Chief Justice (dissenting).

Appellees filed motion to certify the question of law under consideration in this case to the Supreme Court; first, on the ground that Associate Justice TOWNE YOUNG is not disqualified to sit in the case because of interest in the subject matter, therefore the appointment, by the Governor of Texas, of Honorable AUSTIN S. DODD, as Special Associate Justice to sit with this court, was not authorized, and that the judgment rendered by Associate Justice B. F. LOONEY and Honorable AUSTIN S. DODD is void; second, because of the importance of the question, and, third, because of the dissenting opinion of Chief Justice JOEL R. BOND on the sole question of law, as to whether the surviving widow of Henry D. Lindsley, by the terms of his will, was put to an election to take under the will, or renounce the will and accept a dower of a 200-acre homestead and exempt personal property allowable under the Constitution and statutes of Texas; and whether or not she is entitled to both the bequest and the homestead and personal property.

In the alternative, appellees challenge the judgment as being void because of no legally constituted court rendering it, and because same is in conflict with numerous decisions of the Supreme Court of Texas; thus, manifestly erroneous, and should be vacated.

The majority overruled the motion for rehearing and refused to certify the ques-

tion of law to the Supreme Court, holding, in effect, that Associate Justice YOUNG was interested in the subject matter of the suit, thus disqualified to sit in the cause, that Justice LOONEY and Mr. DODD constituted a legal majority of the court rendering the decision, and that the Supreme Court has jurisdiction of the suit, all of which obviates the necessity of certifying the question. I am not in accord with the holding.

Associate Justice YOUNG is a member of the Masonic Order, a fraternal organization, and a director of the Texas Scottish Rite Hospital for Crippled Children, an inner-charitable benevolent organization of the Masonic Order, located at Dallas, Texas. The hospital, in nomine, is a party to this litigation, being an unchallenged beneficiary under the will of Henry D. Lindsley. The bequest to the hospital is in no way involved in this suit. Justice YOUNG has no personal or pecuniary interest in the subject matter of the suit; but, because of his connection with the organization, and the disagreement of the other two regular members of the court, declined to act and certified his disqualification to the Governor of Texas; whereupon, the Honorable AUSTIN S. DODD was appointed Special Associate Justice to sit in judgment in this cause.

Section 11, Art. 5 of the Constitution, provides, among other things, that "No judge shall sit in any case wherein he may be interested." The statute on the subject (Art. 15, R.C.S.1925) reads: "No judge or justice of the peace shall sit in any case wherein he may be interested." Our Supreme Court, in the case of City of Oak Cliff v. State, 97 Tex. 391, 392, 79 S.W. 1068, said that the interest which will disqualify a judge, within the meaning of the Constitution and statutes, "must be direct and immediate," and, in the course of the opinion, cites with approval, In re Ryers et al., 72 N.Y. T, 15, 28 Am.Rep. 88, "that where a judicial officer has not so direct an interest in the cause or matter as that the result must necessarily affect him to his personal or pecuniary loss or gain * * * then he may sit." In the case of Bramlett v. City of Dallas, Tex.Civ.App., 11 S.W.2d 209, 210, the appellant, on motion for rehearing, challenged the qualification of two members of this court, to wit, B. L. Jones, Chief Justice, and B. F. Looney,

Associate Justice, because of interest in the subject matter. The two members of the court mentioned were owners of property in and taxpayers to the City of Dallas. The subject matter of the suit was an injunction to restrain the issuance and sale of bonds, payable out of a fund created by tax on all property in the City of Dallas. Associate Justice Looney, speaking for this court, said: "After a careful consideration of the subject-matter of plaintiff's suit, and the relief he seeks, we have reached the conclusion that any decree this court may render will not necessarily affect these judges in a pecuniary sense. Their interest in the case is identical with that of other taxpayers to the city, is not direct, personal, or immediate, but contingent and remote, while it may be correctly said that they have an interest, incipient in nature, but not such as disqualifies a judge from sitting in the case." In the case of Love v. Wilcox, 119 Tex. 256, 28 S.W.2d 515, 518, 70 A.L.R. 1484, Chief Justice Cureton declined to sit, because of membership in the Democratic Party, and his candidacy for re-election. The suit was for mandamus to compel the Democratic Executive Committee, an inner-organization of the Democratic Party, to certify Mr. Love's name to the various county chairmen of the State, as a candidate for Governor. In passing upon the disqualification of Chief Justice Cureton, Justice Greenwood, speaking for the Supreme Court, said: "Under the Texas Constitution, it is the duty of the judge to sit save 'in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case.' Section 11, art. 5, Constitution. * * * The only conceivable interest of the Chief Justice in the questions here to be adjudicated is indirect, uncertain, conjectural, contingent, and remote. No man can say other than speculatively whether the court's judicial act, whatever it may be, will redound to his advantage or detriment. On such a state of facts, the law is too well settled in this court to be open to dispute." In that case, the conclusion was reached by the Supreme Court that Justice Cureton was qualified to sit, under the Constitution of Texas; accordingly, he participated in the decision of the cause. Another case which I think

is in point is that of Davis v. State, 44 Tex. 523: Soon after the adoption of the present Constitution, the Judge of the District Court of Jefferson County announced that he "was embarrassed" to proceed with the trial because of his personal interest in the question before the court. The Supreme Court said (re-affirmed and cited with approval in Love v. Wilcox, supra), paraphrasing the language: "The Constitution prohibits a judge from sitting in a case in which he may be interested. Const.1876, art. V, sec. 11. The statute is to the same effect. R.S., art. 1090 [now art. 15]. The interest of the learned judge presiding, however, was simply in the question involved, and not in the result of the suit. This was not such disqualifying interest as would prevent him from trying the cause, or would authorize the appointment of a special judge. The presiding judge not having been disqualified, it was his duty, however embarrassing, to have proceeded with the trial." Grounds of personal interest are specified in the Constitution and statutes, and they have been held by the Supreme Court to be exclusive. Bias or prejudice does not incapacitate or disqualify a judge to try a case. Such is not provided by the Constitution or statute. Chief Justice Gaines, in City of Dallas v. Peacock [89 Tex. 58, 33 S.W. 221], cited by the majority, supra, said: "The interest meant [Const. art. V, sec. 11] is a pecuniary interest; that is, such an interest as is capable of being valued by a pecuniary standard. * * * Taylor v. Williams, 26 Tex. 583."

So, in the case at bar, Justice YOUNG sat and heard the argument when submitted; he did not certify his disqualification until it was disclosed that Chief Justice BOND and Associate Justice LOONEY were not in agreement and that a third member was necessary to a decision. In certifying his disqualification, unbeknown to the other members of the court, or the attorneys for the litigants, Justice YOUNG filed his reasons: "The Texas Scottish Rite Hospital for Crippled Children is a party to this suit. I am a Director of such charitable corporation, and as such actively interested in and directing its affairs. The Hospital, in turn, is one of the beneficiaries under the will of Henry D. Lindsley. My Associates having disagreed over a proper disposition of the case, final decision by this Court would have devolved upon me. I felt a distinct embarrassment in under-

taking to decide the issue; also was convinced of a personal disqualification by reason of the above connection. Accordingly, my certificate to this effect was presented to the Governor." Manifestly, it is shown that the interest of Justice YOUNG in this suit is not a pecuniary interest and not a personal interest, as denominated by the Constitution and statutes of Texas, but was one in common with all members of the Masonic Order and, of course, innumerable citizens of this State, interested in the charitable work of the Hospital for Crippled Children. Justice YOUNG'S sense of propriety as to sitting in the case, because of his connection with the hospital, probably created an embarrassing situation, but, as said in the Davis and Love cases, supra, such embarrassment is no disqualification under the laws of this State, to empower the Governor to appoint a special justice. The Governor of Texas has the power to appoint members of the Court of Civil Appeals and the Supreme Court, only when any member shall be disqualified under the Constitution and statutes (Art. 1815, R.S.). The Governor has no such power where members of said courts merely fail or refuse to act because of embarrassing circumstances. It logically follows that, irrespective of whether Justice YOUNG failed or refused to act, and whatever was his reason, short of disqualifying interest under the law—which is not present here—the Governor exceeded his power in appointing the special justice. Such appointment is a nullity, and the opinion and judgment of Justice LOONEY and Mr. DODD are without legal effect.

The issue involved must be settled, either by the legally constituted members of this court, or by certification of the law questions involved to the Supreme Court. Baldwin v. Baldwin, 134 Tex. 428, 135 S.W.2d 92. As I see this extraordinary situation, a stalemate exists; the judgment being a nullity, no jurisdiction exists in the Supreme Court by writ of error, and it cannot be classed as the "law of the case," observable or enforceable as a valid mandate to the court below.

Furthermore, it is well known to all members of this court that Justice LOONEY and Mr. DODD also belong to the Masonic fraternity, the parent Order of the Scottish Rite; and it might well be presumed that Judges LOONEY and DODD have the same reverence for the Order, sympathetic interest in the crippled children, and the same fine sensibilities as does Justice YOUNG. If Justice YOUNG is disqualified because of his "personal connection" with the Order, then certainly, by the same token, the other members of the constituted court are disqualified. Also, it will be observed that this suit does not involve the probate of the will of Henry D. Lindsley, and in no way affects the bequest to the Texas Scottish Rite Hospital for Crippled Children. The hospital will receive under the will (sec. 8) $10,000, irrespective of the outcome of this suit. Mrs. Lindsley's right to a homestead and exempt personal property (the only question involved) in no way, directly or indirectly, presently or remotely, affects the interest of the hospital. Therefore, if it can be said that a judge, because of his connection with the hospital, has a disqualifying interest in the subject matter of a suit in which the hospital is a party, such is not present in this cause. The disqualification of a judge on the ground of interest, falls only to cases where judicial functions are to be exercised. (30 Am.Jur. p. 769, sec. 54). Hence, in so far as the hospital is concerned, no judicial function was required to be exercised by Justice YOUNG or any member of this court. While it is difficult to lay down any general rule of construction of the term "party" as used to disqualify a judge, which should be applicable under all circumstances and to all persons, yet it may be stated that the term "party" should not be construed in a technical and restricted sense to mean merely a party to the record, but that it should be held to mean anyone who is pecuniarily interested directly in the result of the suit. Manifestly the hospital is not pecuniarily interested in the result of this suit, and not such a party as to disqualify its directors from acting in the case.

In this stalemate condition, what is the recourse? In the Baldwin case, supra, a like situation was presented to the Supreme Court: The Chief Justice of the Beaumont Court of Appeals was not disqualified, but declined or was unable to sit in that case and the other two members could not agree. Because of that extraordinary situation, the Supreme Court took jurisdiction only on certificate, and that, too, without an opinion of the Court

438

of Civil Appeals. That was its only recourse. So, in the case at bar, appellees' motion to certify the question of law should be granted, else the regular members of this court be subject to a writ of mandamus by the Supreme Court, compelling the certificate.

Then, too, as I view the situation, it is incumbent upon this court, because of the dissenting opinion, to certify this cause to the Supreme Court. The majority opinion shows the case to be one over which this court has no final jurisdiction, and the case hinges solely upon a question of law, therefore it should be certified to the Supreme Court under Art. 1852, Vernon's Ann.Civ.St., which provides: "When a dissenting opinion is rendered by one judge as to a conclusion of law material to a decision of the case, the grounds of his dissent shall be entered of record by the dissenting member. Upon motion of a party or upon its own motion the court shall certify the point or points of dissent to the Supreme Court. * * *" Obviously, this cause involves a question of law, the interpretation of the will involved, and the intent of the testator as revealed from the four corners of his will, as to whether the wife is put to an election; and the dissent is of record as to the conclusion of law material to the decision of the case. In 3 Tex.Jur. p. 312, sec. 213, the text reads: "Under the statute providing for certification where one of the judges of the Court of Civil Appeals renders 'a dissenting opinion as to a conclusion of law material to the decision of the case,' it is the duty of the court, upon its own motion or a motion of a party, to certify the question involved." It is clear, I think, that this court is under duty to certify the question of dissent under the extraordinary circumstances that prevail in this cause, to the end that a stalemate may not exist and to confer jurisdiction upon the Supreme Court.

The judgment being a nullity impels me to dissent on any action taken by the purported created majority on the motion for rehearing. The judgment should be vacated, the question involved in the cause should, by all means, be certified to the Supreme Court. Irrespective of whether the judgment is a nullity, the importance of the question should impel the question of law involved to be certified to the Supreme Court. Ordinarily, I am not in favor of burdening our Supreme Court with certificates where our duty is to decide the question; but in view of the questions here involved and the circumstances disclosed, our Supreme Court should settle the law material to the decision of this case.